# 24-2325-cv

## United States Court of Appeals

*for the*

## Second Circuit

BARBARA TILLMAN,

*Plaintiff-Appellant,*

– v. –

GRENADIER REALTY CORP., GRC MANAGEMENT,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

EMILY G. BASS
ANNE L. CLARK
VLADECK, RASKIN & CLARK, P.C.
*Attorneys for Plaintiff-Appellant*
111 Broadway, Suite 1505
New York, New York 10006
(212) 403-7300

CP COUNSEL PRESS  (800) 4-APPEAL • (334570)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ............................................................1

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED...........................................................................2

STATEMENT OF THE CASE ...............................................................3

    I.     STATEMENT OF FACTS ........................................................11

          A.   Plaintiff's Background and Success at GRC ....................................11

          B.   The Loss of the Starrett City Contract..............................................13

          C.   GRC Fires Michetti and Replaces Her with Moorehead..................13

          D.   Defendants Subject Tillman to a Pattern of Biased Treatment ........14

          E.   Moorehead's Biased Comments .......................................................17

          F.   GRC Fires Tillman ............................................................................17

          G.   Statistical Evidence..........................................................................18

SUMMARY OF ARGUMENT .............................................................19

ARGUMENT .......................................................................................19

    I.     THE DISTRICT COURT ERRED IN FINDING INSUFFICIENT
         EVIDENCE OF DISCRIMINATION ....................................................19

          A.   The District Court Misapplied the Applicable Legal Standards ......19

          B.   Plaintiff Demonstrated That Defendants Discriminated Against Her
               Because of Her Age .........................................................................21

          C.   A Reasonable Jury Could Reject Defendants' Purportedly  Non-
               discriminatory Justification for Firing Plaintiff...............................42

    II.    THE DISTRICT COURT ERRED IN DECLINING TO EXERCISE
         SUPPLEMENTAL JURISDICTION .......................................................50

CONCLUSION ....................................................................................50

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Abrams v. Dep't of Pub. Safety,
 764 F.3d 244 (2d Cir. 2014) ...................................................................30

Artope v. Ctr. for Animal Care & Control, Inc.,
 2009 WL 874037 (S.D.N.Y. Mar. 27, 2009)......................................................36

Bacchus v. New York City Dep't of Educ.,
 137 F. Supp. 3d 214 (E.D.N.Y. 2015) ................................................................31

Balko v. Ukrainian Nat. Fed. Credit Union,
 2014 WL 1377580 (S.D.N.Y. Mar. 28, 2014)......................................................26

Banks v. Gen. Motors, LLC,
 81 F.4th 242 (2d Cir. 2023) ...............................................................20, 26, 30

Barrows v. Brinker Rest. Corp.,
 36 F.4th 45 (2d Cir. 2022) ...................................................................46

Bernstein v. New York City Dep't of Educ.,
 No. 21-2670, 2022 WL 1739609 (2d Cir. May 31, 2022)..................................29

Bostock v. Clayton Cnty., Georgia,
 590 U.S. 644 (2020)...................................................................25

Brown v. AMETEK, Inc.,
 No. 22-1497, 2022 WL 17484330 (3d Cir. Dec. 7, 2022) ................................27

Bryant v. Farmers Ins. Exch.,
 432 F.3d 1114 (10th Cir. 2005) ...................................................................40

Burger v. New York Inst. of Tech.,
 94 F.3d 830 (2d Cir. 1996) ...................................................................36

Calhoun v. Acme Cleveland Corp.,
 798 F.2d 559 (1st Cir. 1986)...................................................................28

Carlton v. Mystic Transp., Inc.,
 202 F.3d 129 (2d Cir. 2000) ...........................................................7, 32, 36, 45

Chalfant v. Titan Dist., Inc.,
    475 F3d 982 (8th Cir. 2007) ...................................................24

Chambers v. TRM Copy Centers Corp.,
    43 F.3d 29 (2d Cir. 1994) .....................................................43

Chen v. Triumph Engine Control Sys., Inc.,
    2023 WL 2712532 (D. Conn. Mar. 30, 2023) ...............................24, 44

Cruz v. Bernstein Litowitz Berger & Grossman LLP,
    2023 WL 2691456 (S.D.N.Y. Mar. 29, 2023)...................................41

D'Cunha v. Genovese/Eckerd Corp.,
    479 F.3d 193 (2d Cir. 2007) ...................................................32

In re Dana Corp.,
    574 F.3d 129 (2d Cir. 2009) .............................................9, 20, 23, 43

Danzer v. Norden Sys., Inc.,
    151 F.3d 50 (2d Cir. 1998) ..........................................passim

Davis-Garett v. Urban Outfitters, Inc.,
    921 F.3d 30 (2d Cir. 2019) ....................................................33

Delville v. Firmenich Inc.,
    920 F. Supp. 2d 446 (S.D.N.Y. 2013) .........................................29, 49

Dindinger v. Allsteel, Inc.,
    853 F.3d 414 (8th Cir. 2017) ..................................................34

Dotson v. City of Syracuse,
    2019 WL 6337326 (N.D.N.Y. Nov. 27, 2019).................................35

Doyle v. Mid-Hudson Valley Fed. Credit Union,
    2023 WL 4297192 (S.D.N.Y. June 30, 2023) ..................................28

George v. Pro. Disbosables Int'l, Inc.,
    2017 WL 4574806 (S.D.N.Y. Oct. 12, 2017)................................6, 26

Goldsmith v. Bagby Elevator Co.,
    513 F.3d 1261 (11th Cir. 2008) ...............................................34

Gorzynski v. JetBlue Airways Corp.,
  596 F.3d 93 (2d Cir. 2010) ................................................................21

Hazen Paper Co. v. Biggins,
  507 U.S. 604 (1993)...........................................................................28

Hicks v. Baines,
  593 F.3d 159 (2d Cir. 2010) ..............................................................34

Holowecki v. Fed. Exp. Corp.,
  382 F. App'x 42 (2d Cir. 2010) ..........................................................41

Kazolias v. IBEWLU 363,
  806 F.3d 45 (2d Cir. 2015) ................................................................19

Keith v. Cnty. of Oakland,
  703 F.3d 918 (6th Cir. 2013) .............................................................23

Kirkland v. Cablevision Sys.,
  760 F.3d 223 (2d Cir. 2014) ..............................................................49

Laufer v. Pryor Cashman, LLP,
  2019 WL 1434569 (S.D.N.Y. Mar. 29, 2019)......................38, 44, 47

Leibowitz v. Cornell Univ.,
  584 F.3d 487 (2d Cir. 2009) ...........................................................7, 36

Littlejohn v. City of New York,
  795 F.3d 297 (2d Cir.2015) .............................................4, 25, 33, 37

Luciano v. Olsten Corp.,
  110 F.3d 210 (2d Cir. 1997) ...........................................................8, 40

Malin v. Hospira, Inc.,
  762 F.3d 552 (7th Cir. 2014) .............................................................27

Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.,
  964 F.2d 106 (2d Cir. 1992) ..............................................................42

Marra v. Philadelphia Hous. Auth.,
  497 F.3d 286 (3d Cir. 2007) ..............................................................27

McCabe v. Champion Int'l Corp.,
   916 F.2d 713 (6th Cir. 1990) ...............................................................40

Moll v. Telesector Res. Grp., Inc.,
   94 F.4th 218 (2d Cir. 2024) ................................................20, 43, 45

Morris v. Northrop Grumman Corp.,
   37 F. Supp. 2d 556 (E.D.N.Y. 1999) ...................................................36

O'Connor v. Consol. Coin Caterers Corp.,
   517 U.S. 308 (1996) ...............................................................................32

Raskin v. Wyatt Co.,
   125 F.3d 55 (2d Cir. 1997) ..................................................................29

Rasmy v. Marriott Int'l, Inc.,
   952 F.3d 379 (2d Cir. 2020) .........................................................22, 50

Reeves v. Sanderson Plumbing Prods., Inc.,
   530 U.S. 133 ...............................................................................20, 30, 43

Richmond v. Montefiore Med. Ctr.,
   2023 WL 6216271 (S.D.N.Y. Sept. 25, 2023) ...................................23

Riggins v. Town of Berlin,
   2024 WL 2972896 (2d Cir. June 13, 2024) .......................................19

Rodriguez v. Vill. Green Realty, Inc.,
   788 F.3d 31 (2d Cir. 2015) ..................................................................20

Rose v New York City Bd. of Educ.,
   257 F3d 156 (2d Cir. 2001) .................................................................28

Saenger v. Montefiore Med. Ctr.,
   706 F. Supp. 2d 494 (S.D.N.Y. 2010) ................................................41

Sandler v. Montefiore Health Sys., Inc.,
   2018 WL 4636835 (S.D.N.Y. Sept. 27, 2018) ...................................31

Sassaman v. Gamache,
   566 F.3d 307 (2d Cir. 2009) ................................................................21

Savino v. Town of Southeast,
    572 F. App'x 15 (2d Cir. 2014)............................................................44

Shapiro v. N.Y.C. Dep't of Educ.,
    561 F. Supp. 2d 413 (S.D.N.Y. 2008) ..............................................29

Sheng v. M&TBank Corp.,
    848 F.3d 78 (2d Cir. 2017) ................................................................31

Singh v. Bay Crane Serv. Inc.,
    2015 WL 918678 (E.D.N.Y. Mar. 3, 2015).......................................40

Sprint/United Mgmt. Co. v. Mendelsohn,
    552 U.S. 379 (2008)....................................................................33, 35

Stratton v. Dep't for the Aging for City of New York,
    132 F.3d 869 (2d Cir. 1997) .......................................................passim

Strickland v. United Parcel Serv., Inc.,
    555 F.3d 1224 (10th Cir. 2009) .........................................................25

Tarshis v. Riese Org.,
    211 F.3d 30 (2d Cir. 2000) ................................................................48

Tolbert v. Smith,
    790 F.3d 427 (2d Cir. 2015) .............................................20, 30, 31

Tomassi v. Insignia Fin. Grp., Inc.,
    478 F.3d 111 (2d Cir. 2007) .............................................28, 29, 30

United States v. Rea,
    958 F.2d 1206 (2d Cir. 1992) ............................................................27

Vill. of Freeport v. Barrella,
    814 F.3d 594 (2d Cir. 2016) ..............................................................25

Walsh v. New York City Hous. Auth.,
    828 F.3d 70 (2d Cir. 2016) ................................................................37

Williams v. 55th St. Theatre Found., Inc.,
    1994 WL 501760 (S.D.N.Y. Sept. 13, 1994) ....................................38

Williams v. Quebecor World Infiniti Graphics,
    456 F. Supp. 2d 372 (D. Conn. 2006) ................................................ 29

Zakre v. Norddeutsche Landesbank Girozentrale,
    396 F. Supp. 2d 483 (S.D.N.Y. 2005) ........................................ 31, 32

Zakre v. Norddeutsche Landesbank Girozentrale,
    541 F. Supp. 2d 555 (S.D.N.Y. 2008) ........................................ 24, 44

Zann Kwan v. Andalex Grp. LLC,
    737 F.3d 834 (2d Cir. 2013) ........................................ 5, 24, 26, 49

Zeng v. New York City Hous. Auth.,
    No. 22-138-CV, 2023 WL 4553416 (2d Cir. July 17, 2023) ............... 25, 43, 50

Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP,
    869 F. Supp. 2d 378 (S.D.N.Y. 2012) ................................................ 41

## Statutes

28 U.S.C. § 1291 ........................................................................ 2

28 U.S.C. §§ 1331, 1343 ............................................................. 1

Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. .................. passim

New York City Administrative Code, § 8–101 et seq. ........................... 1, 2, 11, 50

New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ........ 1, 2, 11, 50

## PRELIMINARY STATEMENT

Plaintiff-appellant Barbara Tillman ("plaintiff" or "Tillman") appeals the final order and judgment of Hon. Kiyo A. Matsumoto (the "Decision") granting summary judgment in favor of her former employer defendants-appellees Grenadier Realty Corp and GRC Management (collectively, "defendants" or "GRC"). The District Court's Decision dismissing Tillman's claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA") and declining to exercise supplemental jurisdiction over Tillman's discrimination claims under the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("State Law"), and the New York City Human Rights Law, New York City Administrative Code, § 8–101 et seq. ("City Law"), is erroneous. Because there is sufficient evidence from which a reasonable jury could find that GRC — whose leadership questioned an 84-year old Tillman about when she would retire and admitted that they fired another employee in her 60s to usher in a "new day and new energy" and the "next generation" — fired Tillman because of her age after 40 years of excellent performance, this Court should vacate the Decision and remand this proceeding for trial.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 because Tillman brought claims under the ADEA. On August 12, 2024, the District Court granted summary judgment to defendants on

Tillman's ADEA claims and declined to exercise supplemental jurisdiction over Tillman's remaining claims under State Law and City Law. The following day, August 13, 2024, the District Court issued a final judgment. Tillman filed a timely Notice of Appeal on August 29, 2024. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal of a final decision and judgment of the District Court.

## ISSUES PRESENTED

1. Whether the District Court erred in granting summary judgment on Tillman's ADEA claims by disregarding evidence from which a reasonable jury could find discrimination and erroneously failing to construe all facts and draw all inferences in Tillman's favor.

2. Whether the District Court erred in holding that proffered statistical evidence was, as a matter of law, inadmissible in the absence of expert testimony.

3. Whether the District Court improperly intruded on the province of the jury by making credibility determinations, including in finding credible defendants' interested witnesses.

4. Assuming plaintiff prevails on her appeal of her ADEA claims, whether the District Court erred in declining to exercise supplemental jurisdiction over Tillman's State Law and City Law claims.

2

## STATEMENT OF THE CASE

Until defendants unlawfully fired her in May 2020, Tillman served as defendants' in-house energy expert for over 40 years, an "excellent employee" who was "universally respected." Not long before Tillman's firing, in March 2019 GRC's Board fired GRC's longtime CEO Felice Michetti ("Michetti"), who was 69 years old, to bring about "a new day and a new energy." The Board apparently found that new energy in Ryan Moorehead ("Moorehead"), a 39-year-old whom the Company brought in as Michetti's replacement. Moorehead began targeting Tillman, GRC's oldest employee, nearly immediately. He recommended that she effectively be demoted without evaluating her or her department, recommended firing her in May 2019 (which he later denied), and assigned her a cubicle instead of an office even though offices were assigned to younger, less senior employees. Throughout this time, Moorehead's comments made clear that Tillman's age was top of mind in his decision-making process. In mid-2019, Moorehead asked Tillman if she was able to make it into the office every day, in a tone suggesting Tillman could not. Shortly thereafter, in September or October 2019, Moorehead asked Tillman how much longer she planned to continue working and suggested that Tillman leave GRC to become a consultant, a suggestion he made again in February 2020. When Tillman refused to leave voluntarily, Moorehead fired her in March 2020 at the age of 84. As a result of changes Moorehead spearheaded, GRC fired or laid off most of its older

3

employees, and the average age of GRC's management decreased substantially under his leadership.

The Decision is replete with examples of the District Court improperly construing facts against Tillman and ignoring evidence of bias in finding that Tillman did not raise an inference of discrimination.

For example, as to Michetti's termination, the Decision correctly acknowledged that the circumstances surrounding it — in particular, that the Board admitted that Michetti was fired to bring about a "new day and new energy" and usher in the "next generation" — evidenced discrimination. (Special Appendix ("SPA")-26)  But even though Michetti's and Tillman's firings involved the same decisionmakers, the District Court refused to consider this evidence in Tillman's favor. The District Court failed even to acknowledge well established law that discrimination against others within plaintiff's protected category may give rise to an inference of discrimination. Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir.2015) (It is well-settled that "[a]n inference of discrimination can arise from circumstances including . . . invidious comments about others in the employee's protected group[.]").

Also, in analyzing the pattern of biased treatment to which Moorehead subjected plaintiff, the District Court avoided the interpretation of the evidence that favored Tillman and accepted wholesale defendants' explanations for their actions.

4

The District Court disregarded evidence that Moorehead refused to evaluate Tillman and her department, speculating instead as to potential non-discriminatory reasons for Tillman's exclusion. (SPA-24) The District Court rejected evidence that Moorehead recommended firing Tillman in May 2019, finding that an email Moorehead sent with an attachment that concerned "timing for terminations" for certain employees, including Tillman (Appendix ("A")-876–92) was insufficient. Even though Moorehead authored the email and there was no definitive evidence that the determination was made by someone else, the District Court nevertheless found that Moorehead was not the one who made the recommendation because Moorehead, in his self-serving testimony, denied doing so. (SPA-22) The District Court also found "no evidence" that the decision to deny Tillman an office was motivated by discriminatory animus (SPA-24), even though GRC provided offices to junior employees, including to a poorly performing employee who was significantly younger than Tillman. (A-62–63, 95–98, 132–33)

The District Court likewise refused to consider in Tillman's favor that GRC had demoted her by having her report to a significantly younger and more junior employee. In doing so, the District Court relied on Tillman's testimony that financial reasons may have motivated in part GRC's decision to demote her (SPA-24) and twisted the "but for" causation standard, which as this Court has made clear, does not require that age be the "only" cause of an employer's decision. Zann Kwan v.

Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013). In grounding its rejection of this evidence on Tillman's testimony, the District Court also relied improperly on Tillman's evaluations of the decision-makers' mindset, which would, in any event, have been inadmissible opinion testimony. George v. Pro. Disbosables Int'l, Inc., No. 15-CV-3385 (RA), 2017 WL 4574806, at *3 (S.D.N.Y. Oct. 12, 2017).

The District Court construed in defendants' favor Moorehead's questions to plaintiff about her capabilities and desire to retire because, according to the District Court, there were innocuous reasons for Moorehead to have asked those questions. (SPA-19–20) It strains credulity to think that such comments to an 84-year-old employee were unrelated to her age, particularly when they are made by the decision-maker and, in the case of Moorehead's questions about plaintiff's retirement plans, were made simultaneously with his attempts to force plaintiff to leave her full-time job to become a consultant. (A-100–103, 124–25, 947) But to the extent that the comments were ambiguous, it is well established that a jury, and not the Court on summary judgment, must resolve any such ambiguities, and the Court must interpret any ambiguity in plaintiff's favor. Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) ("[T]he district court's conclusion that [a] remark is ambiguous and susceptible to several nondiscriminatory interpretations, while quite possibly correct, does no more than identify a disputed factual issue as to which the nonmovant's (plausible) interpretation must, at summary judgment, be accepted.").

6

Also, the District Court found that the redistribution of plaintiff's work following her termination did not support a finding of discrimination, including because defendants did not replace plaintiff with a single individual but rather redistributed her responsibilities among younger employees and third-party consultants. (SPA-26–29) This finding was contrary to the law of this Circuit. See Leibowitz v. Cornell Univ., 584 F.3d 487, 503 (2d Cir. 2009) (finding inference of discrimination where, inter alia, plaintiff's duties were primarily reassigned to male instructors); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000) ("[W]e have previously held that a plaintiff has demonstrated an inference of age discrimination . . . where the majority of plaintiff's responsibilities were transferred to a younger co-worker, and shortly thereafter some of plaintiff's other duties were transferred to a newly hired younger employee."). Indeed, the District Court focused on defendants' contention that Tillman's duties primarily were shifted to consultants but ignored that significant duties were shifted to younger employees. (SPA-26–29; see A-62–63, 117–119, 133-34, 686-687, 949, 968, 1035-40, 1047-48)

Even though Tillman demonstrated a stark pattern of age discrimination at GRC since Moorehead's hiring, the District Court rejected Tillman's simple statistical evidence concerning the ages of the individuals at the organization because the evidence was, according to the District Court, purportedly inadmissible as not supported by expert testimony and otherwise not sufficient to establish

7

discrimination. (SPA-29–32) However, there was evidence to show that GRC discharged many of its oldest employees between March 2019 and May 2020, and that the trend continued until at least the summer of 2022. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68) These resulted in the dismissal of all of GRC's employees over 80 and a decrease in the percentage of GRC employees over 70, as well as a decrease in the average age of GRC executives from 61.6 years old to 48.8 years old. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68) In rejecting and refusing to consider this straightforward evidence on the grounds that it was not supported by expert testimony, the District Court disregarded the established law in this Circuit that simple statistical data — as is commonly used in individual discrimination cases — need not be supported by expert testimony. Luciano v. Olsten Corp., 110 F.3d 210, 217 (2d Cir. 1997) (finding no manifest error in admitting statistical evidence in the absence of expert testimony and recognizing, inter alia, that "an expert was not necessary because the data offered was not of a scientific nature but merely reflected existing conditions at the Company at the time of Luciano's termination"); Stratton v. Dep't for the Aging for City of New York, 132 F.3d 869, 877 (2d Cir. 1997) (statistical evidence relying on "simple arithmetic" admissible in the absence of expert testimony). And, should the District Court have considered the evidence, it is precisely of the nature that would have supported an inference of discrimination.

8

The District Court recognized that courts on summary judgment ought to "eschew credibility determinations" (SPA-11) (citing Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004), but failed to apply that standard faithfully in Tillman's case. In particular, the District Court ignored evidence undermining GRC's rationale for Tillman's dismissal that was predicated solely on the testimony of interested witnesses, which a jury need not accept. (SPA-32–41) The District Court flouted the well-established maxim that weighing self-serving statements is a matter for the jury, "not the prerogative of the court on a motion for summary judgment," In re Dana Corp., 574 F.3d 129, 153 (2d Cir. 2009), and disregarded substantial evidence that Tillman presented to support her attacks on the credibility of GRC's witnesses, including, for example:

- Even though Moorehead admitted that he did not evaluate Tillman or her department (A-87–89, 2151–52, 2200), defendants in their submission in support of the motion for summary judgment argued that the Company decided to demote plaintiff following an "in-depth" review. (Id.);

- Despite claiming in his deposition never to have proposed laying off Tillman prior to the submission of the 2020 budget (A-227), GRC's records show that Moorehead did so as early as May 2019. (A-876–92);

- GRC claimed that it did not retain the services of third-party energy consultants prior to Tillman's departure (A-121) a statement that was directly contradicted by Tillman's sworn testimony. (A-948);

- Moorehead claimed that when he first raised the issue of Tillman being a consultant, he did not suggest Tillman resign (A-100–01, 2266–67), a representation not only refuted by Tillman (A-947, 1262–63), but also

9

by the February 18, 2022 document GRC drafted to justify firing Tillman. (A-917–18, 1978)

Far from "broad, conclusory attacks" (SPA-37) (quoting Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005)), these contradictions in the record go to the central questions of defendants' processes and provide an ample basis to question the credibility of defendants' witnesses. The District Court, however, rejected each inconsistency by construing the evidence in defendants' favor or by ignoring it entirely. Having accepted defendants' purportedly legitimate reason for firing Tillman, the District Court then glossed over Tillman's arguments that even if GRC needed to make changes based on their weakened financial state, the decision to fire Tillman was not a rational one. (SPA-42–43; see A-57, 62, 67–68, 84–85, 9–90, 104, 108, 130–34, 1374–75, 1553–54, 1881–82) For example, the Court accepted defendants' explanation that after GRC lost its contract with Starrett City, which had previously funded part of Tillman's salary, GRC needed to take steps to cut costs. (SPA-33–35) However, the Court ignored entirely the evidence undermining this purported economic justification, including that there were several employees for whom GRC assumed the cost of their full salary after the loss of Starrett City and who were not fired, including the much younger HR Director Roderick Robertson and Pat LoRusso, who oversaw construction. (A-84–85, 1881–82, 1984–85)

10

On August 12, 2024, the District Court granted summary judgment on plaintiff's claims under the ADEA, the State Law, and the City Law, holding that plaintiff had not adduced sufficient evidence for a reasonable jury to find that defendants discriminated against her because of her age. (SPA-1–49)

Because it granted summary judgment on plaintiff's age discrimination claims, the District Court declined to exercise supplemental jurisdiction over plaintiff's claims under the State and City Law and dismissed those claims without prejudice.

In short, the District Court construed evidence against plaintiff, rejected or ignored relevant evidence, including plaintiff's striking statistical evidence, and accepted as truth defendants' version of events. These errors compounded one another at each turn of the Decision and resulted in the District Court erroneously granting summary judgment despite ample evidence from which a reasonable jury could find discrimination.

## I.  STATEMENT OF FACTS

### A.  Plaintiff's Background and Success at GRC

Reflective of her capabilities and strong performance, Tillman work at GRC for more than 40 years. (A-57) For over two decades, until September 2019, Tillman was GRC's Senior Vice President for Energy and Special Projects. (A-57, 66, 677,

1373–74, 1860) When GRC fired Tillman mere months later, in March 2020, she was 84 years old, the oldest employee at GRC. (A-57–58, 130, 684-689, 1137)

Tillman was GRC's in-house energy expert, an "excellent employee" who had a strong reputation in the residential housing management industry and was "universally respected." (A-57, 131, 1375) Early in her career with GRC, Tillman worked on a $1.2 million energy conservation study at the Starrett City housing development funded by the United States Department of Energy. (A-64–66, 711–12, 1140–43) After the study's completion, Tillman organized and directed Starrett Energy Services, an energy conservation department for GRC's properties, including Starrett City. (A-64–66; Tillman Tr. 17:6-18:8) During Tillman's tenure, Tillman and, as a result, GRC received numerous accolades. (A-130–31, 680-81, 712–13, 944)

As Senior Vice President for Energy and Special Projects, Tillman, inter alia, oversaw the operations of the Starrett City Power Plant, as well as GRC's smaller properties; obtained grants for energy-related initiatives; handled compliance matters, including compliance with Local Laws 84 and 87; planned and organized energy-related capital improvements and upgrades; identified areas of potential energy savings; and managed certain properties' cogeneration plants. (A-66, 942–45, 1145, 1233–34) In the area of capital improvements, for instance, Tillman spearheaded GRC's successful efforts to obtain grant funding for replacing poorly

12

insulated windows with energy efficient windows, resulting in significant energy savings. (A-945)

B.     The Loss of the Starrett City Contract

During most of Tillman's tenure, GRC managed Starrett City, a large residential housing complex in Brooklyn. (A-72–73, 1834, 1853) After the sale of Starrett City in or about 2017, GRC lost the contract managing Starrett City that it had held since the 1970s. (A-73–74, 1854–55) Tillman's salary, like several other GRC employees, had been partially funded by Starrett City. After the loss of Starrett City, GRC assumed that expense of Tillman's full salary, as it had with several other employees, including HR Director Robertson and LoRusso, who oversaw construction, both of whom are substantially younger than Tillman. (A-84–85, 1881–82)[1]

C.     GRC Fires Michetti and Replaces Her with Moorehead

In March 2019, the Board fired GRC's then-CEO, Michetti, who had been with GRC for two decades. (A-91–93, 131) Michetti was "mystified," considering "the bulk of the revenue GRC had was as a result of contracts that [she] had brought in." (A-91–92, 1437) The only explanation GRC gave Michetti for her firing was a

---

[1] LoRusso had been employed solely by Starrett City, and GRC assumed his entire salary. (A-84–85, 1881–82)

desire for "a new day and a new energy." (A-92, 1437–39) At the time she was fired, Michetti was 69 years old. (A-91–92, 1356)

Before firing Michetti, the Board already had begun discussing bringing in Moorehead as a potential new CEO, through his consulting company Javelin Residential LLC ("Javelin"). (A-85–86, 93) Peter Gray, a GRC owner and Board member, testified that the Board "viewed [Moorehead] as someone who could bring the company kind of into the next generation." (A-86, 93, 1612) In March 2019, Moorehead was 39 years old, 30 years younger than Michetti. (A-60–61, 91–92, 1356, 2060)

D.   Defendants Subject Tillman to a Pattern of Biased Treatment

On April 1, 2019, GRC announced Michetti's departure and the retention of Javelin. (A-85, 695–99) GRC asked Moorehead, through Javelin, to complete an assessment of GRC's senior management employees and their functions and to prepare a report summarizing his findings (the "Javelin Report"). (A-87–88, 669–77, 1614–16, 2112–13, 2133) Just before Moorehead began the review, Board members reassured Tillman that GRC intended to retain her and that there were many important projects for her. (A-83, 1226–28 1602–04; see A-81–83) However, contrary to the Board's directive, Moorehead reviewed all of GRC's senior management employees except Tillman, GRC's then oldest employee. (A-87–89, 669–77, 1615–16, 2151–52, 2200) Despite not reviewing Tillman, Moorehead

14

recommended that Tillman's department be moved under Construction and Technical Services, an effective demotion. (A-89–90, 669–77, 2151–52, 2186–87, 2200) The head of Construction and Technical Services, LoRusso, was a Vice President; Tillman's was a Senior Vice President. (A-62, 89–90 669–77) Tillman's longtime supervisor, Michetti, admitted that having Tillman report to LoRusso "d[idn't] make sense." (A-90, 131, 1463) LoRusso is 24 years younger than Tillman. (A-105-06, 686, 956)

In May 2019, Moorehead proposed laying off Tillman. (A-79, 132, 876-92) When this was unsuccessful, Moorehead instead pursued his plan, proposed in the Javelin Report, to demote Tillman and GRC did so in September 2019. (A-67–68, 90) Despite GRC's supposed reorganization, no one told Tillman that she was no longer a department head or that she had become part of LoRusso's department. (A-62, 65–66, 90, 95–96, 946, 1258) At the same time, Moorehead began the process of promoting Warren Harr, who was considered an "average to poor employee" and 26 years younger than Tillman, to head of Field and Safety Compliance and then, later, to Director of Operations. (A-62–63, 132–133, 956, 968, 1452–57, 1973, 2173–75) Moorehead attempted to push out Tillman despite her ongoing contributions to GRC. Tillman's work generated millions of dollars in savings for GRC's clients, much of which were passed along to GRC because some of the properties benefiting from the energy savings were owned by the same people who

15

owned GRC. (A-67–72, 945) She also had a track record of obtaining grants to fund energy projects. (A-69–70) GRC continues to include Tillman's many accomplishments in marketing materials, including, inter alia: securing more than $30 million in energy grants; making GRC the first management firm to secure funds from Weatherization Assistance Program for government-assisted housing; obtaining several million dollars in grant funds for energy conservation improvements; working with Citizens EnergyCitgo's Oil Grant Program to obtain almost $2.5 million in oil grants and using these funds to install energy efficient upgrades; and saving owners millions of dollars through bulk fuel purchasing. (A-132, 728–33, 948) Gray acknowledged that energy consumption and costs continue to be a major concern for property owners. (A-69–70, 1687)

Moorehead's biased treatment and plan to fire Tillman also was evidenced by his decision to assign her a cubicle instead of an office when GRC moved to Industry City in September 2019, despite him having assigned offices to younger and less senior employees. (A-95–98, 132, 2176) For instance, Harr, a more junior employee who did not hold a "Director" title in September 2019, received an office. (A-95–96, 132, 683, 2176) The only other member of senior management at the time of the Javelin Report to not receive an office, Marlene Ranglin, also was demoted and laid off. (A-96–97, 106, 136, 669–77, 2165-57)

16

### E. Moorehead's Biased Comments

In mid-2019, Moorehead asked Tillman if she was able to make it into the office every day, in a tone suggesting Tillman could not. (A-124–26, 946–47, 1180–81) Consistent with his seeming biased views about Tillman lacking vigor, Moorehead shortly thereafter, in September or October 2019, asked Tillman how much longer she planned to continue working and suggested that Tillman leave GRC to become a consultant. (A-100–02, 124–25, 947) Notwithstanding this patently biased inquiry into her retirement plans, Tillman declined, wishing to remain a full-time employee. (A-101, 947; see 1261–63) The tone and nature of Moorehead's inquiries led Tillman to understand that he was preparing to lay her off. (A-100–01, 919-20, 1261–63)

### F. GRC Fires Tillman

Although Moorehead told Tillman in October 2019 she would continue to be employed by GRC, just a few months later, he proposed laying her off effective March 2020. (A-104–05, 116–17, 919–20) In February 2020, Moorehead again asked Tillman to leave her position at GRC and become a consultant being paid a third of then-current salary. (A-110–11, 113, 147, 1261–65) After Tillman rejected this proposal—which required her to sign a release of all legal claims to accept the new position—and expressed her desire to continue working full-time, GRC fired Tillman in March 2020. (A-116–17, 947–48)

17

Prior to her firing, Tillman had several upcoming projects in addition to her usual work. (A-109–10, 950, 1276–77) After Tillman's firing, GRC distributed her responsibilities to her younger coworkers, LoRusso and Harr, and some consultants. (A-117–22 943, 948–49, 2242–44, 1745-47, 2313–15) Prior to firing Tillman, Moorehead already had begun attempting to shift some of Tillman's responsibilities to Harr and LoRusso (A-133–34, 949; see A-2242–4)

G.    Statistical Evidence

After Moorehead's arrival and under this stewardship, GRC fired or laid off most of its older employees. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68) In March 2019, prior to Moorehead taking over GRC leadership from Michetti, 9% of GRC employees were over the age of 70. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68) By May 2020, less than 4% of GRC's employees were over the age of 70 and GRC employed no individuals over the age of 80. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68) In addition, Moorehead's changes to the executive team resulted, in a short period, in it being more than a decade younger, on average. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68) In March 2019, the executive team was on average 61.6 years old; by 2022, the average age of Moorehead's

18

executive team was 48.8 years old. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68)[2]

## SUMMARY OF ARGUMENT

The District Court's Decision should be vacated because it repeatedly ignored the requirement that the evidence be viewed, and all reasonable inferences be drawn, in favor of the nonmoving party, disregarded established law on the admissibility of statistical evidence in age discrimination cases, and made improper, and unfounded, credibility determinations in favor of defendants' witnesses.

When the evidence is viewed as a whole, construed in plaintiff's favor, and assessed under the proper governing standards, the Decision must be reversed.

## ARGUMENT

I. THE DISTRICT COURT ERRED IN FINDING INSUFFICIENT EVIDENCE OF DISCRIMINATION

A. The District Court Misapplied the Applicable Legal Standards

This Court reviews a grant of summary judgment de novo, "construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." Riggins v. Town of Berlin, No. 23-868-CV, 2024 WL 2972896, at *2 (2d Cir. June 13, 2024) (quoting Bey v. City of New York, 999 F.3d 157, 164 (2d Cir. 2021)); Kazolias v.

---

[2] Plaintiff calculated these trends using basic arithmetic and simple excel functions used to find employees' current ages based on their birthdays and to determine averages. (A-951–54)

IBEWLU 363, 806 F.3d 45, 49 (2d Cir. 2015). Courts must evaluate the evidence as a whole, rather than in "piecemeal" fashion. Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir. 2024) (quoting Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 45 (2d Cir. 2019)).

Courts repeatedly have "expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." Banks v. Gen. Motors, LLC, 81 F.4th 242, 258 (2d Cir. 2023) (citation omitted); Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015); see Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 49 (2d Cir. 2015) ("[A] sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution. Traditionally, this function has been entrusted to the jury.") (citation omitted). Moreover, a court may not give credence to the moving party's evidence unless it comes from disinterested witnesses and is neither contradicted nor impeached. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151(2000); see Dana Corp., 574 F.3d at 152-53 (reversible error to rely on testimony of interested witness for summary judgment). In sum, summary judgment is inappropriate when "the admissible materials in the record make it arguable that the claim has merit." Moll, 94 F.4th at 228.

Contrary to these principals, the District Court disregarded much of plaintiff's evidence, did not consider the evidence as a whole, construed evidence in favor of defendants, and made unwarranted determinations finding credible defendants' interested witnesses.

### B. Plaintiff Demonstrated That Defendants Discriminated Against Her Because of Her Age

In finding that plaintiff failed to establish a <u>prima facie</u> case of age discrimination,[3] the District Court ignored important evidence of discrimination, misconstrued nearly every piece of evidence it considered, accepted wholesale the decision-makers' attempt to explain away their discriminatory process, and never considered the evidence as a whole.

Contrary to the District Court's determination, the record evidence, when taken as a whole, more than meets plaintiff's "minimal burden" to establish an inference of discrimination. <u>See</u> <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 111 (2d Cir. 2010); <u>Sassaman v. Gamache</u>, 566 F.3d 307, 312 (2d Cir. 2009).

### 1. Defendant's Pattern of Biased Conduct

The District Court failed to construe in Tillman's favor that when Moorehead arrived, he assessed all of senior management except for Tillman, the oldest employee. (A-87–89, 669–77, 1615–16, 2151–52, 2200) Moorehead did so even

---

[3] As the District Court correctly found (and defendants did not contest), plaintiff established the first three elements of her <u>prima facie</u> case (SPA-16).

21

though the Board had directed him to assess <u>every</u> member of senior management and recently had assured Tillman there was ample work for her and that her employment would continue despite the loss of the Starrett City contract. (A-87–89, 669–77, 1615–16, 1226–28, 2151–52, 2200) While the District Court acknowledged that "it was not clear why [Tillman] was not interviewed as part of the review," the District Court nevertheless mused that it may be due to the fact that plaintiff "'was not working from the corporate office'" at the time, a weak excuse not even offered by defendants. (SPA-24 (quoting A-676)) Such speculation is impermissible. A jury could question, for example, why Moorehead did not ask plaintiff to come in for an interview or conduct an interview remotely. In any event, this is not a question for the District Court to resolve. <u>Rasmy v. Marriott Int'l, Inc.</u>, 952 F.3d 379, 392 (2d Cir. 2020) (question of motivation is a "quintessential jury function").

Also, in May 2019, Moorehead proposed firing Tillman, and then later denied he had ever made such a recommendation. (A-79, 132, 876–92, 2271) The District Court rejected plaintiff's evidence of this claim – an email from Moorehead with an attachment that concerned "timing for terminations" of certain employees, including Tillman – (A-876–92) as insufficient. (SPA-22–23) According to the District Court, the email did not definitively show that Moorehead was the one who made the recommendation. (SPA-22–23) A reasonable juror certainly could have find, however, that Moorehead's May 2019 email encompassed his own

22

recommendations or endorsements as he was the one sending it. (A-876–92) Further, construing evidence against plaintiff, the District Court found that there was no evidence that the draft document was ever "finalized" and "formally submitted to [GRC] for consideration." (SPA-22–23) But what matters is not what steps GRC actually took to fire plaintiff in spring 2019, but what motivated Moorehead in making the final decision months thereafter. Moorehead's efforts to get rid of Tillman as soon as he started with GRC (and before he even met or reviewed her), evidences bias. See Richmond v. Montefiore Med. Ctr., No. 21 CIV 8700 (PGG), 2023 WL 6216271, at *25 (S.D.N.Y. Sept. 25, 2023) (finding that incoming CEO's decision to fire plaintiff "shortly after assuming the CEO position" supported a finding of discrimination); cf. Keith v. Cnty. of Oakland, 703 F.3d 918, 923 (6th Cir. 2013) (finding triable issues of fact where employers' representative denied accommodation request without ever having met with plaintiff, noting that discrimination laws prohibit employers from acting "based on stereotypes and generalizations").

The District Court also relied, in construing the email, on Moorehead's denial that he ever made such a recommendation. Moorehead's self-serving denials should not have been credited. Dana Corp., 574 F.3d at 153 (weighing "self-serving" statements is a matter for the jury, "not the prerogative of the court on a motion for summary judgment."). And should a jury find, as it would be entitled to, that

Moorehead in fact made such a recommendation, then Moorehead's denial itself would serve as powerful evidence that he was acting on a discriminatory motive. Zann Kwan, 737 F.3d at 846 (stating "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's evidence can establish pretext); Chen v. Triumph Engine Control Sys., Inc., 2023 WL 2712532, at *15 (D. Conn. Mar. 30, 2023) (holding that inconsistent testimony "about material facts, namely the dates [the managers] decided to [fire plaintiff] and who made the decision" "could lead a jury to conclude" that there was unlawful bias).[4]

In addition, the District Court dismissed evidence that GRC assigned Tillman to a cubicle rather than an enclosed office, finding "no evidence" that such a decision "supports an inference of discrimination." (SPA-23–24) A reasonable jury could find otherwise. While GRC denied Tillman office space, claiming that such space was limited, it granted an office to Harr, a much younger, poorly performing employee who was not at the Director level. (A-62–63, 96–98, 132–33, 1452–57, 2176–78) "Of course, the fact that an employer favored someone outside of the relevant protected class 'will ordinarily suffice' to sustain an inference of discrimination."

---

[4] See Chalfant v. Titan Dist., Inc., 475 F3d 982, 991 (8th Cir. 2007) (jury could infer that defendant "knew it might be acting in violation of federal law" where decisionmakers denied responsibility for inconsistent and adverse actions); Zakre v. Norddeutsche Landesbank Girozentrale, 541 F. Supp. 2d 555, 563 (S.D.N.Y. 2008) ("Zakre II") (denial of responsibility for firing decision evidence of intent sufficient to support award of punitive damages), aff'd, 344 F. App'x 628 (2d Cir. 2009).

Vill. of Freeport v. Barrella, 814 F.3d 594, 601 (2d Cir. 2016); see Littlejohn, 795
F.3d at 313.[5] Ignoring this evidence, the District Court, once again, erroneously
accepted GRC's explanation that there were few offices and that "[t]he nature of
[plaintiff's work] did not require [her work] to be under lock and key," (SPA-23–
24); See Zeng v. New York City Hous. Auth., No. 22-138-CV, 2023 WL 4553416,
at *4 (2d Cir. July 17, 2023) (vacating summary judgment where district court,
among other things, improperly credited testimony of plaintiff's supervisor over
plaintiff).

Tillman also presented evidence that Moorehead demoted Tillman by placing
her under LoRusso, who was much younger than her and had a lower title, in a
department that did not "make sense" (A-89–90, 669–77, 686, 719, 2151–52, 1463,
2186–87, 2200), and that no one told Tillman about this irrational demotion. (A-946,
1258) The District Court rejected this evidence, relying principally on Tillman's
testimony that, in addition to GRC's desire to "get rid of the older people," she
believed defendants may have preferred LoRusso because "he was [not] making []

---

[5] On the other hand, that GRC denied office space to some other Director-level
employees (SPA-23–24) is not dispositive of Tillman's claims. See, e.g., Strickland
v. United Parcel Serv., Inc., 555 F.3d 1224, 1231 (10th Cir. 2009) (explaining the
employer was not immunized from liability "simply because some [members outside
the protected group] received detriments before or contemporaneously with . . .
plaintiff"); see also Bostock v. Clayton Cnty., Georgia, 590 U.S. 644, 659 (2020)(the
law "prohibits discrimination against individuals, not groups").

as much money as [plaintiff] was." (SPA-25 (quoting A-1259) The Court found that Tillman's testimony "undermine[d] an inference that her age was a [but for] cause" of her firing. (SPA-25) That determination was erroneous.

First, "but-for' causation does not require proof that [discrimination] was the only cause of the employer's action, but only that the [dismissal] would not have occurred in the absence of the [discriminatory] motive." Zann Kwan, 737 F.3d at 846. As the Supreme Court made clear, this can be a "sweeping standard" and often there is "more than one 'but-for cause' of an adverse employment action." Banks, 81 F.4th at 275 (quoting Bostock, 590 U.S. at 656). Even if GRC preferred LoRusso, in part, for financial reasons, Tillman's "contextual evidence of [GRC's] conduct [is] sufficient to raise material questions as to whether she would have been terminated in the absence of [an unlawful] motive." Balko v. Ukrainian Nat. Fed. Credit Union, No. 13 CIV. 1333 LAK AJP, 2014 WL 1377580, at *22 (S.D.N.Y. Mar. 28, 2014), report and recommendation adopted sub nom. Balko v. Ukrainian Nat'l Fed. Credit Union, No. 13 CIV. 1333 (LAK), 2014 WL 12543813 (S.D.N.Y. June 10, 2014).

Second, the District Court gave improper weight to Tillman's testimony about GRC's motivations, which is not dispositive. The Second Circuit has held that, "[i]n employment discrimination actions, 'Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision.'" George, 2017 WL 4574806, at *3 (quoting Village of

26

<u>Freeport</u>, 814 F.3d at 611) (rejecting employer's attempt to afford dispositive weight to plaintiff's deposition testimony concerning defendants' motivations); <u>United States v. Rea</u>, 958 F.2d 1206, 1216 (2d Cir. 1992) (finding testimony as to defendant's knowledge inadmissible and noting that testimony as to another's state of mind "will often not be 'helpful' within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference . . . .") (quoting Fed. R. Evid. 701). Indeed, a plaintiff's testimony is not dispositive when there is otherwise sufficient evidence. <u>See</u> <u>Brown v. AMETEK, Inc.</u>, No. 22-1497, 2022 WL 17484330, at *2 (3d Cir. Dec. 7, 2022) ("[Plaintiff]'s subjective belief that her managers were acting in good faith when they decided not to promote her is irrelevant . . . ."); <u>Malin v. Hospira, Inc.</u>, 762 F.3d 552, 564 (7th Cir. 2014) (reversing grant of summary judgment because plaintiff's testimony that she did not have information to support her subjective belief of retaliation was different from whether she submitted sufficient evidence of retaliation to preclude summary judgment); <u>Marra v. Philadelphia Hous. Auth.</u>, 497 F.3d 286, 307-08 (3d Cir. 2007) (upholding jury verdict and holding that one plaintiff's testimony that he did not believe manager retaliated against him did not undermine finding of pretext where plaintiff did not have complete information).

27

2.    Moorehead's Biased Remarks

Moorehead's comments also supported a finding of age discrimination. Moorehead questioned Tillman's ability to commute into the office daily, in a tone that suggested she was too feeble to do so. (A-124–26, 946–47, 1180-81) Shortly thereafter, Moorehead proposed that Tillman give up her full-time position and become a consultant and questioned how much longer she planned to keep working. (A-100–02, 124–25, 947) Moorehead's remarks are precisely the type of comments that support an inference of age-based bias. Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 112, 115-16 (2d Cir. 2007) abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009) (questions from plaintiff's supervisor about her retirement plans evidenced age bias); Rose v New York City Bd. of Educ., 257 F3d 156, 158, 162 (2d Cir. 2001) (concluding that supervisor's comment that he would replace plaintiff with someone "younger and cheaper" if plaintiff's refused to follow his directions was direct evidence of discrimination); see also Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)(noting that Congress enacted the ADEA to battle "inaccurate and stigmatizing stereotypes" about older workers' "productivity and competence."). [6]

---

[6] See also Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 562-63 (1st Cir. 1986) (questions about retirement evidenced age bias); Doyle v. Mid-Hudson Valley Fed. Credit Union, No. 20 CV 2087 (NSR), 2023 WL 4297192, at *4 (S.D.N.Y. June 30, 2023) (questions about plaintiff's retirement "even questioned her regarding her retirement plans, even though Plaintiff did not intend to retire in the near term"

The District Court improperly found these comments to be innocuous "stray remarks." Rather than focusing on the factors relevant for determining whether a remark is probative, the District Court, construing the evidence improperly against plaintiff, supposed that both questions could have been motivated by legitimate reasons. (SPA-19–20)[7] However, "[t]he relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." Tomassi, 478 F.3d at 116. Further, to the extent that the remarks were

_____

supporting finding of discrimination); Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 461 (S.D.N.Y. 2013) (questions about plaintiff's retirement plans constituted evidence of age bias); Shapiro v. N.Y.C. Dep't of Educ., 561 F. Supp. 2d 413, 417, 425 (S.D.N.Y. 2008) (questions to 72-year-old employee about his retirement plans were evidence of age discrimination); Williams v. Quebecor World Infiniti Graphics, 456 F. Supp. 2d 372, 383 (D. Conn. 2006) (two inquiries into requirement plans supported inference of age discrimination).

[7]  While the District Court correctly noted that the Second Circuit has found questions about a plaintiff's retirement plans to not raise an inference of discrimination under certain circumstances (SPA-19), those cases are inapposite. In Bernstein v. New York City Dep't of Educ., No. 21-2670, 2022 WL 1739609, at *2 (2d Cir. May 31, 2022) the plaintiff made "no attempt" to draw "a direct link" between the retirement questions and any mistreatment or adverse employment actions."  Here, by contrast, Tillman has set forth evidence showing that these questions were part of a campaign by Moorehead to force plaintiff to leave, and, when she would not, to lay the groundwork to fire her (A-100-01). And Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997), involved facts not at issue here. Id. (questions about plaintiff's retirement plans legitimate in the context of a discussion about plaintiff's promotion; employer "had a legitimate reason to confirm [employee's] interest in a career change notwithstanding the possibility that [employee] would have the option of taking early retirement.").

29

ambiguous, that ambiguity must be resolved by a jury. See Banks, 81 F.4th at 272 ("Indeed, a reasonable jury would not need to strain to find that [supervisor's] remarks" that plaintiff "lacked the skills to handle or resolve the situations about which she complained" "suggest[ed] that [plaintiff's] reactions to the discriminatory harassment were disproportionate or irrational, implicating the racial stereotype of the "angry Black woman.""); Tomassi, 478 F.3d at 116 ("ambiguities" must be interpreted "in the light most favorable to the plaintiff."); Danzer, 151 F.3d at 54 ("[T]he district court's conclusion that [a] remark is ambiguous and susceptible to several nondiscriminatory interpretations, while quite possibly correct, does no more than identify a disputed factual issue as to which the nonmovant's (plausible) interpretation must, at summary judgment, be accepted.") (quotation marks omitted); Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 253 (2d Cir. 2014) (holding that statements like "fitting in" or "better fit" may be about race and at summary judgment phase, the phrases created a reasonable question of fact for the jury).

The District Court gave undue weight to the temporal gap between Moorehead's question and Tillman's firing. There is no bright-line rule for temporal proximity of comments evincing bias. See Reeves, 530 U.S. at 151-53; Tolbert v. Smith, 790 F.3d 427, 437–38 (2d Cir. 2015). Here, the initial inquiry about Tillman retiring set off a sequence of events that lead to her discharge. See Danzer, 151 F.3d at 55-56 (comments made over a year before dismissal evidenced discrimination

30

where they were part of a series of events); Bacchus v. New York City Dep't of Educ., 137 F. Supp. 3d 214, (E.D.N.Y. 2015) (comments made over two-year period that coincided with warnings and disciplinary proceeding that preceded termination). In fall 2019, Moorehead asked when Tillman intended to retire and suggested she resign and become a consultant[8] —the same proposal he made just before firing Tillman in March 2020.

That these remarks were made by Moorehead, a central decisionmaker, confirms their significance. See Tolbert, 790 F.3d at 437–38 (remarks are more probative when made by the decision-maker behind the adverse action); Sandler v. Montefiore Health Sys., Inc., No. 16-CV-2258 (JPO), 2018 WL 4636835, at *9 (S.D.N.Y. Sept. 27, 2018) ("[E]ven a single comment by a decision-maker indicating [] bias or alluding to negative [] stereotypes can be sufficient to raise a genuine dispute as to the employer's motivation for firing an employee. . . ."); Zakre v. Norddeutsche Landesbank Girozentrale, 396 F. Supp. 2d 483, 508 (S.D.N.Y. 2005) ("Zakre I") (recognizing that "most comments [by key employees] potentially

---

[8] GRC cannot present its consultancy agreement as some sort of evidence of good faith or lack of bias because it conditioned the proposal on Tillman signing a release of her claims. Cf. Sheng v. M&TBank Corp., 848 F.3d 78, 85–86 (2d Cir. 2017) (holding that an offer of accommodation conditioned on the dropping of monetary claims is an inadmissible settlement offer and does not meet the ADA's requirements to engage in an interaction process).

31

reflecting bias have evidentiary value" and "although such comments may not be dispositive, they are still relevant and probative").

Moreover, when, as here, there are other indicia of discrimination, "the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear more ominous significance." Danzer, 151 F.3d at 56; Carlton v Mystic Transp., Inc., 202 F3d 129, 136 (2d Cir 2000); see Zakre I, 396 F. Supp. 2d at 508 (explaining that "most comments [by key employees] potentially reflecting bias have evidentiary value" and "although such comments may not be dispositive, they are still relevant and probative").

    3.    Michetti's Biased Firing Bolsters Tillman's Claims

The District Court likewise failed to consider in Tillman's favor evidence that the Board fired longtime CEO, Michetti, under circumstances evidencing age bias. GRC replaced Michetti with Moorehead, who is 30 years younger. (A-60–61, 85-86, 91–93, 1356, 1612, 2060) see O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996) (holding that "the fact that a replacement is substantially younger" to be a "reliable indicator of age discrimination."); D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 195 195 (2d Cir. 2007) (8-year age difference supports inference of discrimination). Michetti's firing was justified based on the Board wanting "a new day and a new energy." (A-92, 1437–38) Likewise, Gray, a GRC owner and Board member, testified that the Board "viewed [Moorehead] as someone

who could bring the company kind of into the next generation." (A-86, 93, 1612) These remarks about "new energy" and the "next generation" support an inference of age discrimination. See Davis, 921 F.3d at 47 (reasonable jury could find comments that employee lacked "energy" and "stamina" to be "euphemisms about her age"); Danzer, 151 F.3d at 53 (concluding that comments about needing "new blood" supported inference of age discrimination"). Michetti was "mystified" as to why she was being fired, as she generated the bulk of GRC's revenue. (A-91–92, 1437) The same Board members later approved Moorehead's biased proposal to lay off Tillman. (A-104–115, 1731, 2281, 2284)

Although the District Court admitted that the Board's comment about a "new energy" supported an inference of discriminatory intent "with regard to terminating Michetti's employment" (SPA-26), the District Court ultimately discarded the evidence as "not especially probative of the decision to terminate Plaintiff," which happened not long thereafter. (Id.). In doing so, the District Court failed even to acknowledge well established law that discrimination against others within plaintiff's protected category may give rise to an inference of discrimination. Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387–88 (2008) (holding that evidence of discrimination against other employees may be admissible even when the actor had no role in the adverse employment action against plaintiff); Littlejohn, 795 F.3d at 312 ("It is well-settled that "[a]n inference of discrimination can arise

33

from circumstances including . . . invidious comments about others in the employee's protected group[.]"); Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (proof of causation can be shown by "'circumstantial evidence such as disparate treatment of fellow employees [in same protected class].'"); see Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1286 (11th Cir. 2008) ("[Plaintiff] and coworkers . . . were discriminated against by the same supervisor, . . . so the experiences of [the coworkers] are probative of [supervisor]'s intent to discriminate. [Another employee] was involved in the termination decisions of all four individuals, so the experiences of [coworkers] are probative . . . ."); Dindinger v. Allsteel, Inc., 853 F.3d 414, 426 (8th Cir. 2017) (testimony in equal pay case from other women who were paid less than men was admissible and probative even where women did not hold the same position or report to the same supervisors as plaintiff).

In its analysis ultimately rejecting the evidence of discrimination against Michetti, the District Court relied heavily on the gap in time between Michetti's firing and plaintiff's. (SPA-26) But Michetti's firing was part of the "sequence of events" that began with the Board bringing in Moorehead to "bring [the Company] into the next generation" and culminated in plaintiff's dismissal. Danzer, 151 F.3d at 55. This sequence included, among other things, Moorhead recommending Tillman's termination in May 2019 (one month after Michetti's departure), asking about

34

plaintiff's retirement plans, and suggesting that plaintiff leave GRC to become a consultant (approximately six months after Michetti's departure).

Also, the temporal proximity of the two events is just one many non-dispositive factors courts consider in determining the probative value of the evidence.[9] Sprint/United Mgmt. Co., 552 U.S. at 388 (holding that the inquiry is "fact-intensive" and "context-specific," depending on "many factors, including how closely related the evidence is to the plaintiff's circumstances and the theory of the case.").

The District Court also relied improperly on Michetti's own subjective assessment about GRC's motivations for firing her (noting that Michetti "formed no theories or beliefs as to the reason her employment was being terminated."). Of course, such testimony is not dispositive, see supra Section I.B.1. Indeed, as the District Court found that Michetti's firing, orchestrated by the same decisionmakers, occurred under circumstances that could give rise to an inference of discrimination (SPA-26), the Court should have considered it.

---

[9] Dotson v. City of Syracuse, No. 511CV620BKSATB, 2019 WL 6337326, at *4 (N.D.N.Y. Nov. 27, 2019) (listing factors to consider in determine admissibility of such evidence under Fed. R. Evid. 403, including relationship of evidence to plaintiff's firing; involvement of same "bad actors"; temporal and geographic proximity; knowledge of the decision by others in organization; whether employees were similarly situated; and the nature of the employee's allegations).

4.    <u>Reassignment of Plaintiff's Work to Younger Individuals</u>

The District Court found that the redistribution of plaintiff's work following her termination did not support a finding of discrimination because plaintiff was not replaced by a single individual.[10] (SPA-26–29) This finding was plainly contrary to the law of the Second Circuit, where Courts routinely find that a redistribution of plaintiff's work among multiple individuals outside of her protected class may support a finding of discrimination. <u>See</u> <u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 503 (2d Cir. 2009) (finding inference of discrimination where, <u>inter alia</u>, plaintiff's duties were primarily reassigned to male instructors); <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 135–36 (2d Cir. 2000) (distribution of responsibilities among multiple younger coworkers supported finding of age discrimination); <u>Burger v. New York Inst. of Tech.</u>, 94 F.3d 830, 834 (2d Cir. 1996) (concluding that evidence that a portion of plaintiff's duties were not eliminated but transferred to younger employees supported a discrimination finding); <u>Artope v. Ctr. for Animal Care & Control, Inc.</u>, No. 05 CIV. 9283 (KMW)(RLE), 2009 WL 874037, at *9 (S.D.N.Y.

---

[10] <u>Morris v. Northrop Grumman Corp.</u>, 37 F. Supp. 2d 556, 572 (E.D.N.Y. 1999), which the Court relied on in finding that plaintiff was not "replaced" where her responsibilities were merely redistributed (SPA-42), is inapposite. There, the Court held that to establish a <u>prima facie case</u> "under the facts of this case (namely reduction in position, not discharge), the plaintiff must present evidence that . . . he was replaced . . . ." <u>Id.</u> Because there is no question here that plaintiff was fired, the many Second Circuit cases holding that a redistribution of responsibilities to younger individuals may support an inference of discrimination apply.

36

Mar. 27, 2009) ("[E]ven if an employer eliminates a plaintiff's position, the circumstances may nonetheless give rise to an inference of discrimination if the employer then reassigns the plaintiff's duties to another employee").

In declining to follow that line of cases, the District Court reasoned that, unlike in many of those cases, "plaintiff was not one of many employees," but rather had "a unique role at [GRC] with distinct responsibilities." (SPA–28) But plaintiff's specialized role (A-130–31), only underscores the discriminatory nature of GRC's decision. After firing plaintiff, GRC distributed many of her responsibilities to Harr and LoRusso. (A-117–22, 943, 948–49, 2242–44, 1745-47, 2313–15) Harr, who was 59 at the time GRC fired plaintiff, was a poor performer who did not have plaintiff's experience in energy-related consulting. (A-62–63, 686–687, 949, 968, 1452–57, 1173–74, 1973, 2173–76) Nor did LoRusso, who was also 59 at the time of plaintiff's firing. (A–62, 104–05, 131, 686, 1913–14, 1459–60) "From this evidence, a rational finder of fact could reasonably conclude that [Tillman] was more qualified than at least one" of the individuals to whom her responsibilities were reassigned. Walsh v. New York City Hous. Auth., 828 F.3d 70, 78 (2d Cir. 2016); see Littlejohn, 795 F.3d at 312–13 (replacement with individual outside of plaintiff's protected class who lacks employee's experience supports inference of discrimination).

The District Court also relied on GRC's disputed assertion that plaintiff's work was "shifted almost entirely to third-party consultants." (SPA-28–29) The only

evidence supporting GRC's assertion of an industry-wide shift to consultants is the testimony of Moorehead, an interested witness. (A-99–100) A jury need not credit defendants' disputed assertions predicated exclusively on the assertions of interested witnesses without any other support. See Laufer v. Pryor Cashman, LLP, No. 16-CV-8487 (JPO), 2019 WL 1434569, at *9–10 (S.D.N.Y. Mar. 29, 2019) (explaining that jury could disbelieve testimony of interested witnesses and find pretext as to employer's firing explanation given absence of documents supporting the rationale besides testimony of interested witnesses).[11]

Not only may a reasonable jury disbelieve plaintiff's evidence, there is good reason to do so. Despite GRC's assertion to the contrary, GRC retained the services of energy consultants during Tillman's employment. (A-121–22, 931–33, 948, 1747, 2315) GRC continues to work with at least one of those consultants, who is now presumably supervised by LoRusso or Harr instead of Tillman. (A-120–22, 133–34, 931–33, 948, 1747, 2315) GRC also continues to employ younger employees whose

---

[11] Even if the assertion that consultants effectively replaced Tillman were credited, which it should not be, evidence that plaintiff's responsibilities were reassigned to third-party consultants may still support a finding of discrimination. See Williams v. 55th St. Theatre Found., Inc., No. 93 CIV. 3385 (LBS), 1994 WL 501760, at *5 (S.D.N.Y. Sept. 13, 1994) (rejecting argument that plaintiff was not "replaced" by someone outside of his protected class where duties were given to an independent contractor, noting that "i[t] is well established in the Second Circuit that a plaintiff is not required to show he was actually 'replaced' by a younger employee . . . evidence that his duties were taken away and given to a younger man [] is adequate, we hold, to raise an inference of age discrimination.").

38

responsibilities are partially covered by consultants, including Harr. (A-109, 2173–2176)

5.    Demographic Changes

The District Court rejected Tillman's proffered statistical evidence concerning the ages of the individuals at the organization because the evidence was, according to the District Court, inadmissible as not supported by expert testimony and otherwise not sufficiently specific to demonstrate discriminatory intent.

GRC discharged many of its oldest employees between March 2019 and May 2020, and that the trend continued until at least the summer of 2022. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68) These changes resulted in the dismissal of all of GRC's employees over 80 and a decrease in the percentage of GRC employees over 70, as well as a decrease in the average age of GRC executives from 61.6 years old to 48.8 years old. (A-134–35, 138–39, 669–77, 684–89, 951–56 963–68) Plaintiff calculated these trends using basic arithmetic and simple excel functions used to find employees' current ages based on their birthdays and to determine averages. (A-951–54)

In rejecting and refusing to consider this straightforward evidence on the grounds that it was not supported by expert testimony, the District Court disregarded the established law in this Circuit that simple statistical data – as is commonly used in individual discrimination cases – need not be supported by expert testimony.

39

Luciano, 110 F.3d at 217 (finding no manifest error in admitting statistical evidence in the absence of expert testimony, finding, inter alia, that "an expert was not necessary because the data offered was not of a scientific nature but merely reflected existing conditions at the Company at the time of Luciano's termination"); Stratton, 132 F.3d at 877 (calculations relying on "simple arithmetic," including determinations of average ages, admissible in the absence of expert testimony). In particular, the District Court failed to consider whether the statistical evidence was "of a scientific nature" such that an expert would be required (which it was not) or if Tillman's proffered data merely reflected "conditions at the time" such that no expert would be necessary. Singh v. Bay Crane Serv. Inc., No. 11 CV 720 RJD RER, 2015 WL 918678, at *5 (E.D.N.Y. Mar. 3, 2015) (denying employer's motion in limine to exclude evidence of the racial composition of its employees in the absence of expert testimony where the evidence entails simple data that does not require expert analysis to be properly admitted); see Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1117 (10th Cir. 2005) ("[I]t is permissible to submit simple statistical calculations such as averages without first being designated as an expert witness."); McCabe v. Champion Int'l Corp., 916 F.2d 713 (6th Cir. 1990) ("[T]here is no requirement that statistical evidence be supported by expert testimony.").[12]

---

[12] The cases on which the District Court relied in rejecting the evidence (SPA-29–30) do not require a different result. In each of those cases, unlike here, the Court identified specific reasons to believe that plaintiff's evidence was incomplete or

Here, there was no "gerrymandering" of the numbers or "selective sampling" of the information – all of which came from defendants' own documents – that would necessitate complicated expert analysis. Stratton, 132 F.3d at 877.[13] While the District Court noted that "not all of the employees who departed GRC were terminated" (SPA-31), the reasons for each employee's departure goes to the weight of the evidence, not its admissibility. Stratton, 132 F.3d at 877 (finding that drop in average age of senior employees could "add color" to a discrimination claim and

_____

misleading. See Holowecki v. Fed. Exp. Corp., 644 F. Supp. 2d 338, 360 (S.D.N.Y. 2009), aff'd, 382 F. App'x 42 (2d Cir. 2010) ([P]laintiffs purport to rely on certain raw numbers and statistics that allegedly demonstrate that a disproportionally small number of FedEx couriers with twenty or more years of service reached full or 'normal' retirement age at the company . . . Such figures, though, are both inaccurate and misleading [including that] these statistics only relate to couriers with twenty or more years of continuous service in the same courier job code [] and thus fail to take into account those couriers that changed job codes during their employment[.]"); Cruz v. Bernstein Litowitz Berger & Grossman LLP, No. 20-CV-8596 (VF), 2023 WL 2691456, at *10 (S.D.N.Y. Mar. 29, 2023) (rejecting statistical evidence where plaintiff argued that "85% of employees "who held administrative roles" and were terminated between 2017 and 2020 were over the age of 40 [but] [provided] no evidence as to the ages of all the employees in administrative roles, or even of the median or average age of Defendant's administrative employees."); Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP, 869 F. Supp. 2d 378, 396 (S.D.N.Y. 2012) (no other evidence of discrimination, plaintiff's statistical evidence "arbitrarily excluded a large number of people in the protected category. . . ."); Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 516 (S.D.N.Y. 2010)("[T]he data in the record only contains the ages of the doctors who Defendant fired, it does not provide the ages of the doctors that Defendant did not fire.").

[13] Notably, defendants in their motion papers do not argue that expert testimony was necessary to support plaintiff's analyses, nor did they argue that plaintiff's data was selective or misleading.

noting with approval district court's instruction to jury that "the statistics plaintiff showed you are not conclusive proof in any way of an employer's reasons for a particular discharge [but] may be relevant simply on the question of motive").

Tillman's statistical evidence, should the District Court have considered it, would have been precisely the type of evidence that could provide further support to an inference of discrimination. Stratton, 132 F.3d at 879-80 (concluding that charts showing that the "average age of senior staff dropped nearly five years . . . after [a] new [c]ommissioner took over" supported age discrimination finding); Maresco v. Evans Chemetics, Div. of W.R. Grace & Co., 964 F.2d 106, 113 (2d Cir. 1992) (reasoning that employer's "decision to terminate two of the three older accounting employees, and none of the twenty younger employees, present[ed] circumstances which g[ave] rise to an inference . . . that age was impermissibly considered").

### C. A Reasonable Jury Could Reject Defendants' Purportedly Non-discriminatory Justification for Firing Plaintiff

Contrary to the District Court's findings (SPA-33–43), a reasonable jury readily could find pretextual defendants' purportedly legitimate reason for firing plaintiff, which is based entirely on the testimony of its interested witnesses.

While the District Court stated correctly that courts on summary judgment ought to "eschew credibility determinations," (SPA-11) (citing Amnesty Am, 361 F.3d at 122 (quoting Weyant v. Okst, 101 F.3d 845, 854 (2d. Cir. 1996)), it failed to apply that standard. In particular, the District Court ignored evidence undermining

the rationale for Tillman's dismissal that defendants had proffered and that was predicated solely on the testimony of interested witnesses, which a jury need not accept. (SPA-32–41) In so doing, the District Court failed to follow the well-established maxim that weighing self-serving statements is a matter for the jury, "not the prerogative of the court on a motion for summary judgment." Dana Corp., 574 F.3d at 153; Reeves, 530 U.S. at 151 (testimony of interested witnesses not credited during summary judgment); see Moll, 94 F.4th at 248 (finding that District Court "did not adhere to the summary judgment principles," including that a court is "required to disregard all evidence favorable to the moving party that a jury would be entitled to disbelieve" where the court accepted as true defendants' proffered rationale for firing plaintiff); Zeng, 2023 WL 4553416, at *4.

Importantly, defendants provided no evidence other than interested witness testimony supporting its argument that finances were the reason for Tillman's firing. The District Court, relying entirely on the testimony of these witnesses (SPA-39–41), erroneously held that it need not "without affirmative evidence warranting an adverse inference, disregard the witnesses' uncontroverted assertions." (Id.) However, it is well established that a court may not accept as true the statements of an interested witness. Dana Corp., 574 F.3d at 152; Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994) ("Though the [witness's] affidavit proffered an explanation [for defendant's conduct], that explanation, even if it were not

43

inconsistent with some of the other evidence proffered by [defendant], need not be accepted by a factfinder. The court was not free to accept the [witnesss] affidavit as true as a matter of law."); Laufer, 2019 WL 1434569, at *9 ("[While] testimony [of defendant's witnesses] could certainly convince a reasonable juror that [employer's] motives for terminating [employee] were pure . . . . [] at the summary judgment stage, the Court must "'disregard all evidence favorable to the moving party that the jury is not required to believe.'" (quoting Reeves, 530 U.S. at 151)); see also Savino v. Town of Southeast, 983 F. Supp. 2d 293, 303 (S.D.N.Y. 2013), aff'd, 572 F. App'x 15 (2d Cir. 2014).

And contrary to the District Court's finding that Tillman made only "broad, conclusory attacks" on the credibility of GRC's decisionmakers (SPA-37), the record contains ample admissible evidence that undermines their testimony. See Chen v. Triumph Engine Control Sys., Inc., 2023 WL 2712532, at *15 (D. Conn. Mar. 30, 2023) (holding that inconsistent testimony "about material facts—namely, the dates [the managers] decided to [fire plaintiff] and who made the decision" "could lead a jury to conclude" that there was unlawful bias (citing Zann Kwan, 737 F.3d at 846)); Zakre II, 541 F. Supp. 2d at 563 (conflicting testimony about who made decision to fire plaintiff supported punitive damages).

First, although GRC certainly should have records reflecting its claimed serious financial losses, the alleged lack of revenue of Tillman's work compared to

other departments, the alleged cost savings of using consultants, and the purported major budget shortfall and how dismissing Tillman would help address it, GRC did not offer any such documents or other corroborating evidence. Carlton, 202 F.3d at 137 (finding disputed issues of material fact where it was "surprising that there was no contemporaneous proof" of the fact[s] supporting defendants' purportedly legitimate, non-discriminatory reasons); see Moll, 94 F.4th at 249 (reasonable juror might disbelieve decision-maker where, among other things, he could not "point to any document on which he had relied in making his decision."). Moreover, despite claiming a series of planned reductions in force to address serious economic issues, GRC also failed to produce any documents reflecting how the lay-off decisions were made. As a jury readily could find GRC's witnesses not credible, the failure to proffer any actual evidence supporting these assertions is telling.

Second, defendants' explanation rationalizing the biased decision to demote Tillman to report to LoRusso is equally suspect. (A-88–90, 2151–52, 2200) To support its action, GRC falsely contends that Moorehead conducted an "in-depth review" and then "concluded" that Tillman's department was not active. (A-87–90). The District Court disregarded Tillman's evidence that GRC's claim was false, noting that "Moorehead explicitly stated in his report that a 'formal review was not conducted' of Plaintiff's department, and he offered some 'initial thought[s]' based on discussions with others at Grenadier. (SPA-36 (citing A-676) But Moorehead's

45

written statement only demonstrates that GRC, in its summary judgment papers, overstated how thorough its "review" was. And even though GRC claims it was able to "conclude" that the functions reporting to Tillman were not being utilized, as explained above, Moorehead admits that he did not even interview Tillman before making this purported evaluation. (A-88–90, 2151–52, 2200)

Third, even though evidence confirms that Moorehead proposed laying off Tillman as early as May 2019, the District Court erroneously accepted explanations otherwise. (A-78–79, 132, 876–92, 2271) While the District Court, construing evidence against plaintiff, found that there was no support in the record that Moorehead actually made such a recommendation (SPA-38), for the reasons explained above, supra Section I.B.1., a reasonable jury could certainly find that his May 2019 email (A-876-92) did exactly that.

Fourth, the District Court failed to consider or discuss GRC's false claim that GRC did not retain the services of third-party energy consultants prior to Tillman's departure, a statement that was directly contradicted by Tillman's sworn testimony. (A-121–22, 931–33, 948; see 1747, 2315) Tillman's testimony directly undermines defendants' explanations concerning reassignment of Tillman's work, the District Court failure to consider it is plainly erroneous. See Barrows v. Brinker Rest. Corp., 36 F.4th 45, 50-51 (2d Cir. 2022) (concluding that court erred in not considering plaintiff's sworn declaration as evidence).

46

Finally, Moorehead claimed that when he first raised the issue of Tillman being a consultant, he did not suggest that Tillman resign, but merely talked in general terms about her setting up her own consulting business. Moorehead's testimony was not only refuted by Tillman (A-947, 1262–63), but also by GRC's own document – the February 18, 2022 document GRC drafted to justify firing her. (A-100–01, 111, 1978; see A-917-18 ("In September of 2019 Ryan Moorehead approached Ms. Tillman with an offer of converting her full time, permanent employee status to a consultant role.")). Incredibly (and without even addressing the February 18, 2022 document), the District Court once again took GRC's word for it in concluding that there was "no evidence in the record that undermine[d]" Moorehead's claim.[14]

If GRC's witnesses are not credited, see Laufer, 2019 WL 1434569, at *10, then there is no basis for determining that Tillman's demotion was rational, that Tillman's firing was a cost-cutting measure, that Tillman's workload did not justify her continued employment, that Tillman's energy services did not generate revenue for GRC, that GRC did not reallocate Tillman's job responsibilities to Harr and

---

[14] There is additional evidence in the record from which a reasonable juror could question Moorehead's credibility, including that even though he is the full-time CEO of GRC, he has never been a GRC employee. Instead, GRC hired Moorehead through a consulting arrangement with Javelin, of which Moorehead is the sole employee, CEO, and managing partner. (A-60, 1681–83, 2060, 2088)

47

LoRusso, and that GRC now uses unpaid consultants to perform her job duties. (A-67-71, 103-05, 109-10, 115-16, 117-19).

Because the District Court accepted without question the self-serving testimony of defendants' witnesses, however, it failed to even consider whether GRC's justification for firing Tillman even made sense. Tarshis v. Riese Org., 211 F.3d 30, 37 (2d Cir. 2000)(finding pretext where "the proffered explanation in light of all the circumstances" is not "a rational one.").

There is ample evidence in the record that absent age bias, GRC would not discharge Tillman, a long-term, excellent employee and leader in her field (A-131, 1375, 1553-54), yet keep the much younger Harr, a poor-performing employee with no area of specialty who used consultants in his job and not only kept his job but whom Moorehead repeatedly promoted (A-132-33, 1454, 2173–75) In addition, while GRC has produced no records supporting its claim of a deficit in the department Tillman was moved to (without her knowledge), that department was led by the much younger LoRusso, whose salary was previously paid entirely by Starrett City. (A-62, 67-68, 90, 108, 686, 719-22, 946, 1258, 1881–82) Tillman was not even moved into LoRusso's department until September 2019 (A-65-68, 2176–77), so even if there was a deficit in that department at the end of the year, using that as a basis to fire Tillman is suspect.

48

Defendants' baseless justification is, itself, further evidence of their discrimination against plaintiff. Pretext can "constitute powerful evidence of discrimination." Stratton, 132 F.3d at 879 (quotation marks omitted). Thus, an employee can prove age discrimination "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate non[-discriminatory] reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Zann Kwan, 737 F.3d at 846 (applying but-for test in retaliation case). "The Second Circuit has 'reject[ed] any categorial rule requiring . . . plaintiffs to offer, in addition to their prima facie case and evidence of pretext, further evidence that age discrimination was the actual motivation in order to satisfy their burden.'" Delville, 920 F. Supp. 2d at 462 (quoting Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469 (2d Cir. 2001)); see Kirkland v. Cablevision Sys., 760 F.3d 223, 227 (2d Cir. 2014) (reversing summary judgment because despite plaintiff's negative performance reviews, if jury credited at least some of plaintiff's evidence challenging the proffered reason, it could find discrimination).

Considering the evidence as a whole, a reasonable jury could find GRC fired Tillman because of her age.

49

## II.  THE DISTRICT COURT ERRED IN DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION

Because the District Court "declined to exercise supplemental jurisdiction over" plaintiff's State and City Law claims and dismissed them "due solely to the absence of any remaining federal claims," the denial of supplemental jurisdiction should "likewise [be] vacate[d]." Zeng, 2023 WL 4553416, at *2 n.3; Rasmy, 952 F.3d at 393 (same).

### CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that this Court correct the obvious errors below by vacating the District Court's Decision and remanding this case for trial.

Dated:   New York, New York
         December 12, 2024

Respectfully submitted,

VLADECK, RASKIN & CLARK, P.C.

By:   _____*/s/*_____
      Anne L. Clark
      Emily Bass
      Attorneys for Plaintiff-Appellant
      111 Broadway, Suite 1505
      New York, NY 10006
      (212) 403-7300

## CERTIFICATE OF COMPLIANCE

Anne L. Clark, attorney of record for Plaintiff-Appellant, hereby certifies that the foregoing brief complies with the type volume limitation as set forth in FRAP 32(a)(7). This brief is in 14-point Times New Roman font. The total number of words in the foregoing brief, based upon the word count of the word-processing system used to prepare the brief, is 12,112.

Dated: New York, New York
December 12, 2024

VLADECK, RASKIN & CLARK, P.C.

By: _____ */s/* _____

Anne L. Clark
Attorneys for Plaintiff-Appellant
111 Broadway, Suite 1505
New York, NY 10006
(212) 403-7300

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Memorandum and Order of the Honorable Kiyo A.
    Matsumoto, dated August 12, 2024, Appealed
    From ........................................................................ SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X

BARBARA TILLMAN,

               Plaintiff,           **MEMORANDUM & ORDER**

    - against -              21-CV-4827 (KAM)(MMH)

GRENADIER REALTY CORP. and GRC
MANAGEMENT,

               Defendants.

----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

    Plaintiff Barbara Tillman (the "Plaintiff") brings three causes of action against Defendants Grenadier Realty Corp. and GRC Management (together "Grenadier" or the "Defendants") based on alleged discrimination in violation of (1) the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"); (2) the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 et seq.; and (3) the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code, § 8-101 et seq. (*See* ECF No. 1, Complaint ("Compl.").) Plaintiff seeks declaratory and injunctive relief; compensatory, liquidated, and punitive damages; and other appropriate equitable and legal relief. (*Id.* at pp. 10-11.) Defendants move for summary judgment dismissing Plaintiff's complaint in its entirety. For the reasons set forth below, the Court grants Defendants' motion for summary judgment

with regards to Plaintiff's ADEA claim, and declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which are dismissed without prejudice.

## BACKGROUND

**I.   Factual Background**

The following facts are taken from the parties' Local Rule 56.1 statement and counter-statement, as well as from documents and transcripts cited in the parties' Local Rule 56.1 statements. (*See* ECF No. 45-2, Defendants' Statement of Undisputed Material Facts ("Def. 56.1"); (ECF No. 46-1, Plaintiff's Counter-Statement ("Pl. 56.1").) Except as otherwise indicated, the facts set forth below from the parties' Local Rule 56.1 statements are undisputed. The court summarizes only those facts that are relevant and material to the adjudication of the instant motion.

Plaintiff Barbara Tillman, who was 84 years old at the time of the filing of the Complaint, worked for Grenadier between May 1976 and March 2020. (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.) Defendant Grenadier Realty Corporation is a property management company, and Defendant GRC Management is an affiliated entity that operates as an LLC. (Def. 56.1 ¶ 2.) Plaintiff served in many different roles at Grenadier, beginning with overseeing rentals at a housing development in Brooklyn called Starrett City (also known as "Spring Creek Towers"). (Def. 56.1 ¶¶ 4, 14-16; Pl. 56.1 ¶ 4.) Plaintiff's most recent role at Grenadier prior to her separation was Director

2

SPA-3

of Energy Services.  (Def. 56.1 ¶ 1.)

Plaintiff's work at Grenadier included energy conservation work, including organizing and directing Starrett Energy Services, an energy conservation department for Grenadier's properties. (*Id.* ¶ 17.)  This work led Plaintiff to become Grenadier's Senior Vice President for Energy and Special Projects, and Plaintiff's duties included overseeing the operations of the Starrett City Power Plant, Local Law 84 and 87 compliance,[1] and other energy and conservation efforts.  (*Id.* ¶¶ 18-19.)  From the 1970s until February 2019, because Plaintiff performed a substantial amount of work for both Grenadier and Starrett City, her salary was split between the two entities, with each paying half.  (*Id.* ¶¶ 22-24.)

Grenadier first began managing the Starrett City property in the mid-1970s, and the property remained Grenadier's largest and most lucrative contract throughout the period in which Grenadier managed it.  (*Id.* ¶¶ 31-32.)  In the fall of 2017, however, the ownership of Starrett City announced that the property was up for sale, and on May 8, 2018, the property was sold to a separate entity, BSC.  (*Id.* ¶¶ 34-35.)  BSC severed the property management relationship with Grenadier shortly thereafter, and Grenadier ultimately ceased managing the Starrett City property in February

---

[1] "Local Law 84 requires residential housing buildings to report their energy and water usage to New York City on a yearly basis, while Local Law 87 requires such buildings to report the state of their energy conservation every ten years."  (Def. 56.1 ¶ 20.)

3

SPA-4

2019. (*Id.* ¶ 36.) The loss of the Starrett City contract was significant to Grenadier, and a Grenadier Board Member testified that the Starrett City contract alone made up more than a third of Grenadier's entire revenue in 2017 and 2018. (*Id.* ¶ 37; Pl. 56.1 ¶ 37.) Following the loss of the contract, Grenadier began cutting costs, including revising its severance plan to limit the amount of severance to which officers were entitled. (Def. 56.1 ¶ 40, 44.) Grenadier ultimately terminated its severance pay plan completely on July 8, 2019, reduced the amount of vacation entitlements for employees, and transitioned to a less expensive health plan. (*Id.* ¶¶ 46-47.)

Grenadier also underwent an organizational restructuring process and engaged in several rounds of layoffs following the loss of the Starrett City contract. (*Id.* ¶ 49.) As these layoffs began, Plaintiff communicated with Roderick Robertson ("Robertson"), Grenadier's Director of Human Resources and Administrative Services, in February 2019, inquiring as to whether she would be terminated from employment. (*Id.* ¶¶ 6, 59.) Based on Plaintiff's communications with Robertson, Grenadier's Board of Directors scheduled a meeting with Plaintiff to discuss her continued employment. (*Id.* ¶ 60.) Peter Gray ("Gray"), a member of the Board of Directors, attended the meeting on March 13, 2019, along with Plaintiff, Robertson, and David Goldban ("Goldban"), Grenadier's General Counsel. (*Id.* ¶¶ 7, 61.) During the meeting,

4

SPA-5

Gray explained that Grenadier planned to retain Plaintiff in her current position, given that there were projects available for her to work on, including cogeneration projects at some properties and compliance work. (*Id.* ¶¶ 63-64.)  Plaintiff did not immediately respond to Gray's request that she continue on as an employee and asked for time to get back to Grenadier with a final decision. (*Id.* ¶¶ 65-66.)  Plaintiff later conveyed to Robertson that she planned to stay at Grenadier in her current role. (*Id.* ¶ 67; Pl. 56.1 ¶ 67.)

In retaining Plaintiff, Grenadier assumed the full cost of her salary, given her salary had previously been shared evenly with Starrett City. (Def. 56.1 ¶ 69.)  Around the time that Plaintiff made the decision to remain in her role, Grenadier retained Javelin Residential ("Javelin"), a consulting company, to perform, among other things, an operational assessment of Grenadier following the loss of the Starrett City contract. (*Id.* ¶¶ 70-71.)  Grenadier and Javelin agreed to a four-month engagement from April 2019 to July 2019. (*Id.* ¶ 74.)  Javelin completed its initial review and submitted a report to Grenadier which included the following recommendation for the Special Projects department, which fell under Plaintiff:

> At the time of our review, we were informed that the functions of this department had been suspended and the department head was not working from the corporate office. A formal review was not conducted; however, based on our first month of this assignment services

5

SPA-6

were not being provided to the properties. As the focus was primarily in the area of energy management, value exists in maintaining a role. Our initial thought is to restructure the role within another department to provide better coverage and accountability.

**Recommendation: Restructure this role to sit under Operations/Technical Services.**

(ECF No. 46-3, Exhibit A to the Clark Declaration ("Pl. Ex. A"), at 8-9[2] (emphasis in original).)

Around the time that the Javelin review was ongoing, Felice Michetti ("Michetti"), Grenadier's then-CEO and Chairperson, was separated from the company on April 1, 2019. (Def. 56.1 ¶ 83.) Gray testified in his deposition that the ownership of Grenadier began to search for a new CEO in "probably February or March" of 2019. (ECF No. 48-3, Deposition of Peter Gray ("Gray Dep."), at 97.) Discussions began with Ryan Moorehead, the founder of Javelin -- the company conducting the operational assessment -- at some point thereafter, and Grenadier and Moorehead reached an agreement for Moorehead to become CEO in August 2019. (Def. 56.1 ¶¶ 71, 90.) Ultimately, Moorehead was referred to as Grenadier's CEO beginning in September 2019, and the company reached a written agreement regarding his role as CEO in December 2019, with a term to begin on January 1, 2020, and conclude on December 31, 2021, subject to renewal. (*Id.* ¶¶ 91-92.)

After Moorehead joined Grenadier as its new CEO in September

---

[2] Unless otherwise noted, the Court's pincite refer to the ECF-assigned page number, and not the internal pagination or bates number of the document itself.

SPA-7

2019, he had an oral conversation[3] with Plaintiff regarding whether she had considered, or would consider, offering her energy services as a consultant.  (*Id.* ¶¶ 106-08, 111.)  Plaintiff rejected Moorehead's idea and stated that she wished to remain an employee of Grenadier.  (*Id.* ¶ 112.)  One or two weeks later, on October 4, 2019, Plaintiff emailed Moorehead, referenced the prior conversation, and stated "I believe I should assume that I'm just about laid off."  (*Id.* ¶ 113.)  Moorehead replied by email as follows:

> Not the case. You are still employed by GRC, with title, pay and duties until you hear otherwise from me. I asked that you take some time to think about the proposal of becoming a consultant and what that would need to look like for you.

(ECF No. 46-3, Exhibit KK to the Clark Declaration ("Pl. Ex. KK"), at 252.)  Plaintiff remained in her current position with Grenadier following the email exchange.  (Def. 56.1 ¶ 117.)  At some point thereafter, Moorehead proposed that Plaintiff's job functions either be transferred to a third-party company or that Plaintiff be offered a written consultancy proposal to become an energy consultant.  (*Id.* ¶ 122.)  Grenadier also contemplated further layoffs, outsourced some accounting functions, and outsourced some safety and violation services at this time.  (*Id.* ¶¶ 125, 128-29,

---

[3] Plaintiff disputes the characterization of the conversation in the Defendants' Rule 56.1 statement but agrees that the conversation occurred and that the topics discussed included, among other things, whether she had considered switching from begin an employee of Grenadier to being a consultant.  (Pl. 56.1 ¶ 108.)

SPA-8

135.)

Following Moorehead's recommendation, Grenadier offered Plaintiff a consultancy agreement to provide energy services directly to managed properties. (*Id.* ¶ 136.) Robertson later described the idea of offering Plaintiff a consultancy as "a way to help the company financially, but also maintain [Plaintiff's] expertise." (ECF No. 48-4, Deposition of Roderick Robertson ("Robertson Dep."), at 178.) During the discussions between Plaintiff and Moorehead about becoming a consultant, Plaintiff asked Moorehead to give her a "proposal" regarding the consultancy arrangement. (ECF 48-1, Deposition of Barbara Tillman ("Tillman Dep."), at 137-39.) Moorehead drafted a written consultancy agreement with the assistance of counsel and presented the agreement to Plaintiff on February 28, 2020. (Def. 56.1 ¶ 140.)

The written consultancy agreement stated that Grenadier would pay Plaintiff a monthly retainer fee to monitor seven different properties, most of which Plaintiff previously provided energy-related services to or was familiar with. (*Id.* ¶¶ 141-42.) In exchange for her services, Plaintiff would receive a monthly retainer fee for each of the seven properties for a total of $3,300 per month, which would work out to less than $40,000 per year. (*Id.* ¶ 144, 147; *see also* ECF No. 46-3, Exhibit I to the Clark Declaration ("Pl. Ex. I"), at 32-39.) Plaintiff declined the consultancy proposal after receiving it, noting during her

8

deposition for the instant case that at the time the pay "had a big effect on me" and that she did not attempt to negotiate a better deal because she "thought it was hopeless." (Tillman Dep. at 141-42.)    Moorehead subsequently recommended Plaintiff's termination to Grenadier's Board of Directors. (Def. 56.1 ¶ 154.) Moorehead informed Plaintiff of her termination during an in-person meeting on March 6, 2020. (*Id.* ¶ 159.)    Following Plaintiff's termination, Grenadier distributed some of Plaintiff's energy-related tasks, including Local Law 84 and 87 compliance to third parties. (*Id.* ¶¶ 165-66; 169.)    Moorehead testified at his deposition that Grenadier does not pay these third party energy consultants for their work, and the consultants are instead paid out of a commission the consultants receive in connection with energy purchase contracts they execute. (ECF No. 48-5, Deposition of Ryan Moorehead ("Moorehead Dep."), at 263-64.)

**II. Procedural History**

Plaintiff filed a charge against Grenadier alleging unlawful age discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on December 21, 2020, and the EEOC issued Plaintiff a notice of her right to sue on June 10, 2021. (*See* Compl. ¶¶ 5-6.)    Plaintiff subsequently filed her complaint in this case on August 26, 2021, alleging age-based discrimination under Federal and New York law. (*See generally id.*) Defendants appeared and answered on September 24, 2021, and did not assert

SPA-10

any counterclaims.  (ECF No. 7, Defendants' Answer.)  The parties subsequently engaged in discovery and certified the close of all discovery on September 28, 2022.  (ECF No. 23, Status Report.)  A pre-motion conference was held on January 3, 2023, to discuss Defendants' anticipated motion for summary judgment, and a briefing schedule was ordered.  (Minute Entry dated January 3, 2023.)  After the motion for summary judgment was filed, but before it had been decided, the parties requested a settlement conference before Magistrate Judge Marcia Henry, which was held on June 23, 2023.  (Minute Entry dated June 23, 2023.)

Although a settlement was not reached, the parties expressed an interest in continuing settlement discussions, and the Court terminated the pending motion for summary judgment to facilitate further settlement discussions.  (Docket Order Dated June 26, 2023.)  Additional settlement conferences were held on July 13, 2023, and September 13, 2023, but a settlement was not reached, and the Defendants therefore renewed their motion for summary judgment on September 20, 2023.  (*See* ECF No. 45, Notice of Motion for Summary Judgment; ECF No. 45-1 Defendants' Memorandum of Law ("Def. Mem."); ECF No. 46, Plaintiff's Memorandum of Law in Opposition ("Pl. Mem."); ECF No. 47, Defendants' Reply in Support ("Def. Reply").)

**LEGAL STANDARD**

Defendants move for summary judgment pursuant to Federal Rule

of Civil Procedure 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. For a genuine issue of material fact to exist, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

In reviewing a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d. Cir. 1996)); *accord Tolan v. Cotton*, 572

11

SPA-12

U.S. 650, 651 (2014) ("[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (alteration in original) (quoting *Anderson*, 477 U.S. at 255)).

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 256-57. To meet this burden, however, a party opposing summary judgment must "come forward with specific facts showing that there is a *genuine issue for trial*," not merely "show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

It is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines*, 239 F.3d 456, 466 (2d Cir. 2001). "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Nonetheless, the Second Circuit has "emphasized that trial courts must be especially chary in handing

12

out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000).

## DISCUSSION

Defendants seek summary judgment as to all of Plaintiff's claims of discrimination, arguing that her termination "was completely driven by economic considerations" and therefore her claims of age discrimination are "untenable." (Def. Mem. at 3.) Defendants further argue that the allegedly ageist comments highlighted by Plaintiff "fail to show discriminatory intent" and were "singular, isolated questions" made to Plaintiff five months prior to her termination. (*Id.*)

Plaintiff argues in opposition that Defendants seek summary judgment "based largely on the testimony of interested witnesses" and that the testimony of these witnesses forms the basis for many of Defendants' arguments regarding the need for cost-cutting efforts. (Pl. Mem. at 1-2.) Plaintiff further argues that Grenadier "removed many of its older employees beginning in March 2019" including Michetti, who was 69 years old at the time of her removal, and Plaintiff, who was 84. (*Id.* at 1.)

As explained below, the Court finds that Plaintiff cannot prevail on her ADEA discrimination claims and accordingly grants

SPA-14

Defendant's motion for summary judgment as to that claim. Having dismissed Plaintiff's ADEA claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I.    ADEA Claim

The Court first examines Plaintiff's claim arising under the ADEA, before turning to her state law claims. *See Doolittle v. Bloomberg L.P.*, No. 22-CV-9136 (JLR), 2023 WL 7151718, at *7 (S.D.N.Y. Oct. 31, 2023) (finding that the 2019 amendment of the NYSHRL "rendered the standard for NYSHRL claims closer to the standard of the NYCHRL.").

### A.    Legal Framework

Discrimination claims under the ADEA "are analyzed under the *McDonnell Douglas* burden-shifting framework." *Carr v. New York City Transit Auth.*, 76 F.4th 172, 177 (2d Cir. 2023) (citing *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012). Under this framework, "once a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's action against the employee. If the employer does so, then the burden shifts back to the employee to show that the employer's articulated reason is pretext for discrimination." *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 86-87 (2d Cir. 2022) (internal quotation marks omitted) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804-05

14

(1973)). "The plaintiff bears 'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Carr*, 76 F.4th at 177 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

"'[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.'" *McEvoy v. Fairfield Univ.*, 844 F. App'x 420, 421 (2d Cir. 2021) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, (2009) (finding that "[w]ithout sufficient evidence that [defendant]'s decision to select a new pre-law director was because of [plaintiff]'s age, no reasonable juror could find that her age was a but-for cause of the decision to replace her.").

**B.  Prima Facie Case**

"Under the McDonnell Douglas scheme, establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). "To establish a prima facie case, a plaintiff with an age discrimination claim must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination." *Bucalo*, 691 F.3d at 129. These are "minimal" requirements, and

SPA-16

the burden they impose on a plaintiff is "not onerous."  *Id.* at 128.

There is no question that Plaintiff was within the age group protected by the statutory provisions under which she brings her claim.  The ADEA's protections apply to "individuals who are at least 40 years of age."  29 U.S.C. § 631(a).  Plaintiff, who was 84 years old at the time she was terminated by Defendant, is plainly within the protected class under the ADEA.  The parties do not dispute that Plaintiff was qualified to work as the Director of Energy Services, or that Defendants' termination of Plaintiff's employment constituted an adverse employment action.  Thus, Plaintiff can establish the first three elements of a prima facie case of age discrimination.

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in [] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  "In the context of age discrimination claims, an inference of discrimination arises, for example, when the plaintiff is 'replaced by someone substantially younger.'"  *Rimpel v. AdvantageCare Physicians, P.C.*, 486 F. Supp. 3d 625, 634 (E.D.N.Y.

16

SPA-17

2020) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 187 (2d Cir. 2006)).

Plaintiff contends that four sets of circumstances surrounding her termination give rise to an inference of discrimination. First, Plaintiff alleges that there was a pattern of biased treatment at Grenadier, including certain comments by Moorehead that reflect his age-related bias. (Pl. Mem. at 10-15.) Second, Plaintiff argues that the removal of Grenadier's CEO, Michetti, took place "under circumstances evidencing age bias." (*Id.* at 15-16.) Third, Plaintiff argues that her work was reassigned to two employees who were, at 60 and 58, more than two decades younger than her. (*Id.* at 16-21.) Fourth, Plaintiff argues that Grenadier's company-wide layoffs resulted in the average age of the company's leadership team decreasing by more than a decade and a decrease in the percentage of employees over 70 from 9% to 4%. (*Id.* at 21-24.) The Court will consider each set of circumstances in turn.

### 1. Moorehead's Comments

Plaintiff argues that two comments by Moorehead in particular support an inference of discrimination. First, "[i]n or around October 2019, Moorehead asked [Plaintiff] how much longer [she] planned to work." (ECF No. 46-4, Declaration of Barbara Tillman ("Tillman Decl."), ¶ 35.) Second, "[a]t some point in mid-2019, Moorehead called [Plaintiff] and asked [her] if [she] was able to

come into the office every day . . . [and] [f]rom the question and his tone, [she] understood that Moorehead was implying [she] was too old and feeble to physically make it into the office." (*Id.* ¶ 34.)  The Court does not find that the remarks by Moorehead support Plaintiff's ability to establish an inference of discrimination.  As the new CEO of Grenadier, which was facing the loss of one third of its business, Moorehead was overseeing Grenadier's organizational restructuring along with several rounds of layoffs.  (Def. 56.1 ¶¶ 37, 49; Pl. 56.1 ¶ 37.)

Remarks regarding a plaintiff's age or suggesting an employer's preference for younger workers may give rise to an inference that the plaintiff's termination was motivated by age discrimination, though "[t]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (internal quotations omitted).  In determining whether a remark is probative of discrimination, courts "have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."

*Id.*

Considering the first factor, it is undisputed that Moorehead was involved in the decision to terminate Plaintiff. (Def. 56.1 ¶ 157.) Nonetheless, the remaining factors weigh against finding the remarks probative of discrimination. The remarks in question were made several months before Plaintiff was terminated, and the Court does not find the content of the remarks to support an inference of discrimination.

Considering Moorehead's question about how much longer Plaintiff planned to work, the Court notes that the Second Circuit has explained that merely questioning an employee about when they plan to retire, even repeatedly, "[does] not raise an inference of age discrimination because they are legitimate questions an employer could ask an employee." *Bernstein v. New York City Dep't of Educ.*, No. 21-2670, 2022 WL 1739609, at *2 (2d Cir. May 31, 2022) (summary order); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) ("The ADEA does not make all discussion of age taboo. Nor does the fact that [a plaintiff's] eligibility for early retirement came up in a conversation . . . support an inference that age played a role [in the alleged adverse employment action].").

Furthermore, Moorehead's question about whether Plaintiff was able to come into the office does not evince age-related discriminatory intent, based on the record. *See Potash v. Fla.*

SPA-20

*Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 589 (S.D.N.Y. 2013) (finding, in the gender discrimination context, that the "[p]laintiff's mere subjective belief that she was discriminated against because of her gender does not sustain a gender discrimination claim"). According to Plaintiff's deposition testimony, she was working from home when Moorehead called her and asked her if she could "come into the office for now on every day." (Tillman Dep. at 55.) Plaintiff interpreted Moorehead's question as "his asking could I do it, was I disabled or not was the way I thought he was talking." (*Id.*) The Court does not find Moorehead's question, singly or in combination with other comments, to support an inference of discrimination. At the time of Moorehead's question, prior to Plaintiff's termination in March 2020, and prior to remote work engendered by the COVID-19 pandemic, Plaintiff was working from home, by her own admission, and Moorehead asked if she was able to work from the office instead, a reasonable question for any employee who was currently working remotely. The Court finds Moorehead's questions are markedly distinct from those presented in the case cited by Plaintiff, *Tomassi v. Insignia Fin. Grp., Inc.*, in which a manager "made frequent references to [the plaintiff's] age," suggested that "[the plaintiff] related well to and 'could understand the mentality of'" other senior citizens, and recommended the plaintiff retire "so that she could 'take time off to rest.'" 478

F.3d 111, 112 (2d Cir. 2007).

Finally, although the question about Plaintiff's retirement plans was made while simultaneously inquiring as to Plaintiff's interest in working as a consultant, both of the comments discussed above were made after Grenadier lost one-third of its revenue from Starrett City, and at least four months before the decision to terminate Plaintiff's employment. *See, e.g., Yoselovsky v. Associated Press*, 917 F.Supp.2d 262, 278 (S.D.N.Y. 2013) (listing cases in which comments made four to five months prior to the plaintiff's termination did not constitute evidence of discrimination). Taken together, the Court does not find Moorehead's questions support an inference of discrimination.

### 2.  Plaintiff's Position Following Restructuring and the Termination of Michetti

Plaintiff also argues that other actions taken by Grenadier with regards to Plaintiff's employment and the termination of Michetti as CEO in April 2019 support an inference of discrimination. (Pl. Mem. at 10-11, 15-16.)  Other actions that Plaintiff argues support an inference of discrimination include: (1) Moorehead proposed firing Plaintiff in May 2019 without having met her; (2) Moorehead only gave Plaintiff a cubicle, and not an enclosed office, in Grenadier's new office space; and (3) Moorehead demoted Plaintiff "on paper" by "placing her under LoRusso." (*Id.* at 10-12.)

The evidence Plaintiff cites in support of the contention that Moorehead had "proposed terminating" Plaintiff's employment prior to meeting Plaintiff is unavailing. Plaintiff offers what appears to be an email chain dated May 17 through 22, 2019, between multiple individuals from Grenadier's Board of Directors, Starrett Companies LLC, Belveron Partners, and Javelin Residential. (ECF No. 46-3, Exhibit CC to the Clark Declaration, at 209-13.) Attached to the email is a spreadsheet showing what the email describes as "assumptions around eliminating select GRC employees in the coming months." (ECF No. 46-3, Exhibit DD to the Clark Declaration, at 215-24.) Plaintiff is indeed listed in the group of individuals the document identifies as being slated for termination, but there is no evidence in the record to suggest that (1) Moorehead was the individual who proposed Tillman be terminated[4]; or (2) that the draft document was ever finalized and formally submitted to Grenadier for consideration. (*Id.*) Furthermore, Moorehead testified at his deposition that "from [his] recommendations regarding the budget, regarding the payroll, staffing, [Plaintiff] was never contemplated nor her role

---

[4] Gray testified in his deposition that Michetti had previously recommended Plaintiff be terminated in connection with the loss of the Starrett City contract. (Gray Dep. at 51.) Michetti testified that "[t]here was never a formal decision that Barbara Tillman would be terminated" because the document that said Plaintiff would be terminated was "a working document." (Michetti Dep. at 70.) Michetti explained that BSC, the new owners of Starrett City, were evaluating whether to bring on existing Grenadier employees in a continuing role, and that no final decision had been made. (*Id.* at 70-71.) These discussions took place prior to the email thread involving Moorehead identified by Plaintiff. (ECF No. 46-3, Exhibit CC to the Clark Declaration, at 209-13.)

contemplated in the [July 2019] layoff." (Moorehead Dep. at 219.) Even if Moorehead had recommended that Plaintiff be terminated, however, Plaintiff fails to explain why such a recommendation would serve as evidence of age-related discrimination, beyond stating that the recommendation was made, as Plaintiff asserts, "before Moorehead had even met Tillman." (Pl. Mem. at 11.) Without any supporting evidence, the Court finds no basis for an inference of discrimination based on age surrounding the alleged recommendation.

Regarding Plaintiff's claim about being given a cubicle, the Court finds no support for an inference of discrimination. Following the loss of the Starrett City contract, Grenadier was required to vacate its office space on the Starrett City property and move to a one floor space in Industry City that largely "consist[ed] of open office space" with only eleven enclosed offices. (Def. 56.1 ¶¶ 93-96.) Plaintiff did not receive an enclosed office in the new space, nor did several other director-level individuals, including the Director of Compliance, the Director of Property Management, and the District Property Manager. (Def. 56.1 ¶ 99.) Moorehead later explained at his deposition that Plaintiff did not receive an enclosed office because "[u]nder the new prescribed [organizational] chart, [Plaintiff] was not going to be a department head [and] . . . the nature of special projects did not require [her work] to be under

23

lock and key[.]" (Moorehead Dep. at 160.) Though the determination of which employee gets what office real estate is always a sensitive subject, the Court finds no evidence that Plaintiff's treatment in receiving a cubicle supports an inference of discrimination.

Finally, regarding Plaintiff's claim about being "demoted" by being placed under Pat LoRusso ("LoRusso"), the Director of Construction and Technical Services, the Court finds no evidence to infer that the reassignment supports an inference of discrimination. As part of Javelin's initial review of Grenadier, led by Moorehead, Javelin conducted interviews with several executives and reviewed the various departments of the company. (Moorehead Dep. at 61.) Although the review was initially scheduled to take place over 90 days, it was later shortened to be a 30-day review given the necessities of Grenadier's relocation out of the Starrett City office space. (Id.) It is not clear why Plaintiff was not interviewed as part of the review, but Javelin's report noted that she "was not working from the corporate office." (Pl. Ex. A, at 8.) Coming out of the abbreviated review, Moorehead and Javelin recommended that Special Projects, the department Plaintiff oversaw, be brought under Operations/Technical Services, the department led by LoRusso. (Id. at 6-8.) Plaintiff's only evidence that the decision to bring her Special Projects within LoRusso's Operations/Technical Services Department was made with

24

discriminatory intent is her own testimony that Grenadier and Javelin preferred LoRusso because "he was [not] making [] as much money as I was" and "they got a better deal on it," and that Plaintiff thinks Grenadier "preferred to get rid of the older people." (Tillman Dep. at 133.) Thus, Plaintiff herself admits that her employer's decision was motivated in part by economic reasons, a motivation which undermines an inference that her age was a "but for" cause of the challenged adverse employment action. *McEvoy v. Fairfield Univ.*, 844 F. App'x 420, 421 (2d Cir. 2021); *see also Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) ("an employer's concern about the economic consequences of employment decisions does not constitute age discrimination under the ADEA, even though there may be a correlation with age"). To the extent Plaintiff "thinks" Grenadier preferred to get rid of older people, and that motivated her reassignment, her subjective belief is not sufficient to support an inference of discrimination absent additional evidence. *See Potash*, 972 F. Supp. 2d at 589; *see also Mandell v. County of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003) ("generalized descriptions of pervasive [bias] within the [police department] are not sufficient to support an inference that" a specific employment action was tainted by that bias").

Turning next to Michetti's termination, Plaintiff alleges that Michetti was fired "under circumstances evidencing age bias." (Pl. Mem. at 15.) Michetti explained in her deposition that she

was "surprised" by her termination and that she did not know the
reason why she was terminated. (ECF No. 48-2, Deposition of Felice
Michetti ("Michetti Dep."), at 88.)    Michetti stated in her
deposition that she formed no theories or beliefs as to the reason
her employment was being terminated. (*Id.* at 89-90.)  Plaintiff
admits that she did not speak to Michetti about the circumstances
surrounding Michetti's termination.    (Tillman Dep. at 125.)
Michetti was indeed replaced as CEO by a younger individual,
Moorehead, and Grenadier's Board described a desire for a "new day
and a new energy" to Michetti when terminating her. (Michetti
Dep. at 91-93.)  Ultimately, the Court finds that the decision to
terminate Michetti, which was made in the immediate aftermath of
the loss of the Starrett City contract, is not especially probative
of the decision to terminate Plaintiff more than a year later.
Nonetheless, the Grenadier Board's comments about a "new energy"
could give rise to an inference of discriminatory intent with
regard to terminating Michetti's employment, but not Plaintiff,
even when viewed in the light most favorable to Plaintiff.

   3.    **Reassignment of Plaintiff's Work**

   Plaintiff does not allege, and the undisputed facts do not
show, that she was replaced by a newly-hired employee, or that her
work was given to a single younger colleague.  Rather, Plaintiff
alleges that her work was redistributed to outside consultants
along with LoRusso, and Warren Harr ("Harr"), Director of

Operations. (Pl. 56.1 ¶ 216.) At least one court in this circuit has found that the redistribution of a terminated employee's work among multiple younger colleagues is an "unexceptional circumstance" that is "insufficient to create an inference of discrimination." *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 505 (S.D.N.Y. 2012); *see also Patterson v. J.P. Morgan Chase & Co.*, No. 01-CV-7513 (LMM), 2004 WL 1920215, at *4-5 (S.D.N.Y. Aug. 26, 2004) (finding no prima facie case where oldest employee in an office was terminated, but not replaced).

The cases that Plaintiff cites in support of her argument that the reassignment of her work establishes an inference of discrimination are inapposite because Plaintiff was not replaced by a younger employee. In contrast to many of the cases cited by Plaintiff involving the elimination of positions during a reduction in force, Plaintiff was not one of many employees in a department – instead, she was the Director of Energy Services, a unique role at Grenadier with distinct responsibilities and with no other employees doing equivalent work inside Grenadier. (Def. 56.1 ¶ 21.) After Plaintiff was terminated, her energy-related tasks were transferred to third-party energy consultants, and neither party alleges that any other employees at Grenadier possessed Plaintiff's expertise in energy consulting. (*Id.* ¶ 165.)

By comparison, in *Burger v. New York Inst. of Tech.*, the Plaintiff was one of "seven non-supervisory persons employed in

the accounting department" and was considered alongside two other employees for termination as part of an overall reduction in force. 94 F.3d 830, 832 (2d Cir. 1996). Similarly, in *Preuss v. Kolmar Lab'ys, Inc.*, the defendant, a cosmetics manufacturer, failed to follow its internal seniority policies in eliminating several positions. 970 F. Supp. 2d 171, 193 (S.D.N.Y. 2013). The remaining cases are similarly distinguishable. *See, e.g., Artope v. Ctr. for Animal Care & Control, Inc.*, No. 05-CV-9283 (KMW) (RLE), 2009 WL 874037, at *9 (S.D.N.Y. Mar. 27, 2009) ("even though Defendants eliminated Plaintiff's position . . . [t]he parties agree that [another individual], in the newly-created position of Director of Operations, was responsible for duties formerly performed by Plaintiff [and] Plaintiff was, in effect, replaced"); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("upon [plaintiff's] termination his duties were transferred in part to Gounalis, a co-worker, who was 18 years younger than [plaintiff], and his remaining duties were given to Oravets, an employee 25 years younger, who was hired three months after Carlton was discharged.").

In the instant case, in contrast, Plaintiff was not one of many interchangeable employees being considered for termination, nor were her duties subsequently reassigned to a newly-hired employee shortly after her termination. Instead, Plaintiff's work was almost entirely shifted to third-party consultants, with two

28

of her previous coworkers assuming some responsibility for supervising the performance of those consultants. The Court finds that the redistribution of Plaintiff's work in the instant case does not support a prima facie case of discrimination.

### 4. Plaintiff's Statistical Evidence

Plaintiff argues that "GRC discharged many of its oldest employees between March 2019 and May 2020," resulting in a "decrease in the percentage of GRC employees over 70 from 9% to 4%" and a decreased average age among executives from "61.6 years old to . . . 48.8 years old." (Pl. Mem. at 20-21.)

It is true that "[w]here a plaintiff lacks evidence of employer conduct that directly expresses discrimination, the plaintiff may rely on statistical or other circumstantial evidence." *Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115, 123 (2d Cir. 1997). However, "[i]f the plaintiff seeks to prove the discrimination by statistical evidence, . . . the statistics must support reasonably the inference that the employer's adverse decision would not have occurred but for discrimination." *Id.* Accordingly, courts routinely reject statistics that are incomplete or unreliable. *See Cruz v. Bernstein Litowitz Berger & Grossman LLP*, No. 20-CV-8596 (VF), 2023 WL 2691456, at *9 (S.D.N.Y. Mar. 29, 2023) (collecting cases); *see also Holowecki v. Fed. Exp. Corp.*, 644 F. Supp. 2d 338, 360-62 (S.D.N.Y. 2009), *aff'd*, 382 F. App'x 42 (2d Cir. 2010) (rejecting plaintiff's

reliance on "certain raw numbers and statistics" to show that a "disproportionately small number of FedEx couriers" reached retirement age because the statistical evidence was "fundamentally flawed"). Moreover, as will be discussed further *infra*, "[a]lthough a generalized statistical analysis of selections in a [reduction in force] can provide circumstantial evidence of an inference of discrimination in support of a prima facie case, as a matter of law, it is not sufficient to establish that the Defendant's legitimate business rationale for eliminating Plaintiff's position is false, or that her age or gender was the real reason for her termination." *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 395-96 (S.D.N.Y. 2012).

As a threshold matter, Plaintiff has failed to provide any expert analysis to support her "statistical" evidence that purports to show a pattern by Defendant of terminating older employees. Statistical evidence that is used to show that an employer "exhibit[s] a pattern of . . . terminating older workers," must be "supported by expert analysis," to meet "minimal standards" of admissibility. *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 515-16 (S.D.N.Y. 2010) (noting that expert analysis is necessary because without it "courts would have a difficult time ensuring that juries consider only 'statistically significant' data"); *see also Bernstein Litowitz Berger & Grossman LLP*, 2023 WL

2691456, at *10 (collecting cases).

Even if Plaintiff's proffered statistics were admissible, the Court does not find that Plaintiff's statistical evidence can establish a pattern of discrimination. For instance, Plaintiff argues that the average age of the executive team decreased significantly from March 2019 to May 2020. (Pl. Mem. at 22.) Plaintiff's own 56.1 Statement presents evidence that not all of the employees who departed Grenadier were terminated; some employees resigned or retired and some of the change in the average age can be attributed to reorganization of the company's structure and changes in the executive structure regarding who reports to the CEO. (Pl. 56.1 ¶¶ 221, 226, 229.) Similarly, Plaintiff argues that the percentage of employees over 70 years old decreased between March 2019 and May 2020, but does not specify whether the decrease was due to the employees' employment being terminated, or voluntary resignation, or other reasons. (*Id.* ¶ 217.) Furthermore, Plaintiff fails to argue or offer evidence that older employees were disproportionately terminated as compared to their younger counterparts who were similarly situated. Without such contextual information, no rational jury could draw any inference regarding Defendant's discriminatory intent, because the evidence presented by Plaintiff would be insufficient for a jury to find Defendants were more likely to terminate older employees. *See Saenger*, 706 F. Supp. 2d at 516 (statistical evidence could not be

used to show unlawful discrimination where "data in the record only contain[ed] the ages of the doctors who Defendant fired" but "d[id] not provide the ages of the doctors that Defendant did *not* fire," and where "Plaintiff d[id] not even claim that the rate of termination for older employees at [Defendant] exceeds the rate of termination for younger employees," rendering the statistical evidence "incomplete and anecdotal") (emphasis in original).

### 5. Plaintiff Has Failed to Establish a Prima Facie Case

Based on the above, the Court finds that Plaintiff has not established that a reasonable factfinder could conclude that the circumstances surrounding her termination create an inference of age-based discrimination, and therefore Plaintiff has not established a prima facie case for discrimination under the ADEA. The only evidence which could possibly support an inference of discrimination is the termination of Michetti, which took place a year before Plaintiff's termination. The Court therefore finds that summary judgment is appropriate on this claim. Nonetheless, even assuming, *arguendo*, that Plaintiff's evidence was sufficient to establish a prima facie case, Defendants have met their burden to produce evidence suggesting a legitimate, nondiscriminatory reason for Plaintiff's termination, as explained below.

### C. Nondiscriminatory Justification

"[A] plaintiff's demonstration of her prima facie case shifts

32

SPA-33

the burden of production to the defendant, who must produce evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *Bucalo*, 691 F.3d at 132. "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. To carry its burden, the defendants "must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection," such that the explanation is "legally sufficient to justify a judgment for the defendant[s]" and "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255-56.

### 1. Grenadier's Weakened Financial State

Defendants argue that they terminated Plaintiff's employment because of Grenadier's "severely weakened financial state and the consequential, good faith restructuring of its business." (Def. Mem. at 19.) Defendants' claim is corroborated by documentary and testimonial evidence that is not in dispute. Plaintiff admitted as much in her deposition when she was asked whether the loss of the Starrett City contract had a large economic impact on Grenadier:

> [Q.] Do you know whether . . . the loss of Starrett City had a large economic impact on Grenadier? . . .
>
> A. It had a serious impact from what I've been told.
>
> Q. And who told you that?

33

SPA-34

> A. Specifically told? I don't even know if anyone told
> me. I just knew it because it was obvious, it's always
> been obvious . . . It was a very important property.

(Tillman Dep. at 88.)    Gray, a member of Grenadier's Board, similarly testified at his deposition that Starrett City was important to Grenadier, noting that he would estimate that more than a "third" of Grenadier's revenue was derived from the Starrett City contract.    (Gray Dep. at 37.)

The loss of the Starrett City contract led Grenadier to take several steps to cut costs.    Gray explained in his deposition that the "deterioration of the financial condition of [Grenadier] . . . after the loss of the Starrett City contract . . . made us realize that [the severance plan] was not . . . something that the company could afford going forward. . . . [I]t was an entirely economic decision."    (*Id.* at 184.)    Grenadier was also required to engage in a significant organizational restructuring process, in order to determine which of the employees it shared with Starrett City would become employees of Starrett City's new management entity, which employees would remain at Grenadier, and which employees would be terminated.    (*See, e.g.,* Def. 56.1 ¶¶ 49-53; Gray Dep. at 45-58 (describing the process of determining how to restructure Grenadier following the loss of the Starrett City contract).) Robertson explained that both his salary and Plaintiff's were paid partially by Starrett City "and [after the loss of the Starrett City contract] we did not know if our positions were going to be

maintained or pulled over or sustained by DVL, by Grenadier, we didn't know." (Robertson Dep. at 112-13.)

Grenadier also took steps to outsource several functions in the months following the loss of the Starrett City contract, which included moving certain accounting functions from in-house positions to external firms. (Moorehead Dep. at 221.) Similarly, Grenadier's safety manager was asked to become a consultant, and when she instead relocated for a different opportunity, her role was absorbed by the director of risk management along with a third-party consultant. (*Id.* at 223.) In preparing the budget for 2020, Grenadier's ownership identified a deficit of around $300,000 in Plaintiff's department, and asked Moorehead to figure out how to "right size" the department. (*Id.* at 229-30.) One of the recommendations that Moorehead made was "to move energy services to a third party" – either by providing a proposal to Plaintiff to do so as a consultant, or by hiring an outside third-party consultant to assume responsibility for energy services for the managed properties. (*Id.* at 230-31.) Moorehead also recommended downsizing the IT department from three to two employees, eliminating an office manager, eliminating additional support staff, and not replacing an accountant that was being terminated. (*Id.* at 231-32.)

### 2. Plaintiff's Objections to Witness Credibility

Without offering evidence to establish a dispute of material

fact, Plaintiff simply "denies" Grenadier's explanation that the layoffs and cost-cutting measures taken after the loss of the Starrett City contract were made "to cut costs after the loss of the Starrett City" contract. (*See, e.g.,* Pl. 56.1 ¶ 40 ("Deny that [revision of the severance policy] was required to cut costs as the factfinder is entitled to disbelieve the testimony of Robertson, an interested witness."); Pl. 56.1 ¶ 50 ("Deny that GRC has presented any documentary evidence that [layoffs from May 2018 to March 2019] [were] due to the loss of the Starrett City contract [and] . . . the factfinder is entitled to disbelieve the testimony of Robertson, an interested witness.").)

It is well-settled that a party opposing summary judgment must present admissible evidence to create a genuine dispute of material fact and that a district court may not make credibility determinations on a motion for summary judgment. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). "If the credibility of the movant's witness is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied." *Sterling Nat'l Bank & Trust Co. v. Federated Dep't Stores, Inc.*, 612 F. Supp. 144, 146 (S.D.N.Y. 1985). This is true even if the credibility of a critical interested witness is only partially undermined in a material way by the non-moving party's evidence. *Chem. Bank v. Hartford Accident & Indem. Co.*, 82 F.R.D. 376, 378–79 (S.D.N.Y.

1979) (denying summary judgment where non-moving party pointed to specific facts that "sufficiently attacked the credibility of the [moving party's] affiants so as to place that fact in issue.")

Here, the Plaintiff has offered no evidentiary facts that create genuine factual disputes or undermine the credibility of the witnesses offered by Grenadier beyond stating that they are "interested witnesses." (Pl. Mem. at 25.)  Plaintiff has not proffered any evidence, such as conflicting sworn testimony or documents, to establish a genuine material factual dispute warranting a trial.  "Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).  Thus, though the Court will view the testimony of Robertson, Moorehead, and other individuals employed by Grenadier in the light most favorable to Plaintiff and must resolve any ambiguities in that testimony in Plaintiff's favor, the Court will not, without affirmative evidence warranting an adverse inference, disregard the witnesses' uncontroverted assertions. *See id; see also McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) ("[the plaintiff] cannot defeat summary judgment on a retaliation claim merely by impugning [Defendant's witness's] honesty").

To the extent Plaintiff attacks Moorehead's credibility directly, (Pl. Mem. at 26), the Court does not find Plaintiff's

arguments to be supported by the evidence.  Plaintiff argues that Grenadier "falsely state[d] that Moorehead conducted an 'in-depth review'" of Plaintiff's department when he was brought over as a consultant.  (*Id.*)  Plaintiff's allegations misstate and distort the record and the Defendants' 56.1. As discussed *supra*, Moorehead explicitly stated in his report that a "formal review was not conducted" of Plaintiff's department, and he offered some "initial thought[s]" based on discussions with others at Grenadier.  (Pl. Ex. A, at 8-9.)  Plaintiff also claims that Moorehead falsely claimed at his deposition not to have proposed laying off Plaintiff prior to the submission of the 2020 budget, an allegation which is not supported by the record, as discussed *supra*.  (*See* ECF No. 46-3, Exhibits CC and DD to the Clark Declaration (email chain which does not show that Moorehead actually recommended to Grenadier that Moorehead be terminated in May 2019).)  Finally, Plaintiff disputes Moorehead's characterization of an earlier discussion with Plaintiff about setting up a consultancy to perform energy work.  (Pl. Mem. at 26.)  It is clear that Plaintiff walked away from her conversation with Moorehead concerned that she was going to be terminated, as stated in her October 4, 2019, email to Moorehead, (*see* Def. 56.1 ¶ 113), who replied that that was not the case in an email immediately afterward (*id.* ¶ 114). Considered together, the Court does not find any evidence in the record that disputes or undermines Moorehead's credibility or prevents the

SPA-39

Court from considering Grenadier's undisputed evidence, including Moorehead's testimony, in this motion for summary judgment.

### 3.    The Decision to Terminate Plaintiff

As mentioned above, Moorehead recommended that, as part of efforts to "right size" the department at Grenadier that included Plaintiff, Plaintiff's work be transferred to a third party, either by converting Plaintiff to be a consultant or by hiring a new third party. (Moorehead Dep. at 229-31.)  Subsequently, Moorehead sent Plaintiff a formal proposal offering her a role as a consultant, which would pay her significantly less than she earned as full-time employee.  (*Id.* at 246-48.)  Moorehead was prepared to negotiate the proposal, but Plaintiff rejected it without submitting any counter-offer.  (*Id.* at 251-52.)  Moorehead subsequently notified Gray that Plaintiff had not accepted the proposal, and that if she did not make efforts to "continue the conversation," Moorehead would terminate her employment by the end of the first quarter of 2020.  (*Id.* at 254-55.)

Moorehead explained his reasoning behind deciding to terminate Plaintiff after she rejected the proposal, as being due to the fact that Plaintiff's department, Special Projects, was "not a revenue-generating division on a consistent basis" and that the cost savings Plaintiff's work resulted in were "primarily for the property [and] not for the management company." (*Id.* at 269-70.)  Moorehead further explained that Plaintiff's workload did

39

SPA-40

not justify the salary that she was earning. (*Id.* at 270.) Moorehead based his conclusion about Plaintiff's workload on discussions he had with third parties. (*Id.* at 267-68.) For those reasons, Moorehead recommended that Plaintiff be terminated. (*Id.* at 269-70.) After Plaintiff's termination, she was not replaced, and the work she did for properties that Grenadier managed was shifted to third-party energy consultants. (*Id.* at 260.) Harr and LoRusso provided some supervision for the third-party consultants but did not perform Plaintiff's work directly. (*Id.* at 261-63; Def. 56.1 ¶¶ 163-65.) Finally, Moorehead testified at his deposition that the third-party energy consultants are not paid by Grenadier itself, as Plaintiff's salary was paid directly by Grenadier, but are instead paid via a commission the consultants receive in connection with energy purchase contracts. (Moorehead Dep. at 263-64.)

Grenadier's evidence that Plaintiff's role at the company was eliminated due to the deteriorating financial situation in the wake of losing the Starrett City contract is sufficient to satisfy Defendants' burden of production. Financial hardship and the elimination of a position constitutes a "legitimate, nondiscriminatory reason" for Plaintiff's termination. *Bucalo*, 691 F.3d at 132. Because the evidence produced by Grenadier is undisputed "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not

[] motivated by discriminatory animus," Plaintiff's prima facie case, to the extent it was sufficiently made, is adequately rebutted. *Burdine*, 450 U.S. at 257.

**D.    Pretext**

At the third stage of the *McDonnell Douglas* inquiry, the Plaintiff "may no longer simply rely on having made out a prima facie case" and the Court, in deciding whether to grant summary judgment, must "determine, by looking at the evidence [Plaintiff] has proffered and the counter-evidence [Defendants] [have] presented, whether [Plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that her age was a 'but for' cause of the [Defendants'] decision to fire her." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). In so deciding, "it is important to consider whether the explanations that [Defendants] gave for [the Plaintiff's] firing were pretextual." *Id.*

To prevail on a claim brought under the ADEA, a plaintiff "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-78 (2009). Here, no reasonable jury could conclude by a preponderance of the evidence that that age discrimination was the "but-for" cause of Plaintiff's termination.

The Court has already discussed in detail the arguments by

SPA-42

Plaintiff to establish that Plaintiff's termination was motivated by age discrimination.  Having found that Plaintiff failed to make out a prima facie case of discrimination under the ADEA, the Court likewise finds that Plaintiff has failed to present sufficient evidence that age discrimination was the "but-for" cause of her termination.  As described *supra*, Plaintiff provides no evidence to refute Defendants' evidence of Grenadier's financial distress and the resulting need for layoffs, reorganization, and cost-cutting beyond generalized and unsupported attacks on witness credibility.

Plaintiff has also offered no evidence that Plaintiff was replaced after she was terminated, and it is undisputed that her work was primarily transferred to third-party consultants who were supervised by two remaining employees of Grenadier.  The Court, therefore, concludes that Plaintiff was not replaced by a younger worker.  *See Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 573 (E.D.N.Y. 1999) ("[A] discharged employee is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. Rather, a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." (citation omitted)).  The fact that Plaintiff was not replaced, and her duties were instead assumed by a combination of third-party

42

consultants and existing employees strongly supports a conclusion that Grenadier's reason for terminating Plaintiff was not pretextual.

Viewing the record as a whole, and in the light most favorable to Plaintiff as the non-moving party, the Court finds that even if Plaintiff has established an issue of fact as to whether Defendants' reasons were pretextual, it is a "weak" one, *see Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000), and the record is completely devoid of any evidence suggesting that age discrimination was the real, but for reason behind Grenadier's decision. Accordingly, summary judgment in favor of Defendants and Plaintiff's ADEA claim is dismissed.

**II. State Law Claims**

**A. NYCHRL Claim**

Plaintiff also brings a claim of age discrimination under the NYCHRL. Because those claims are before the Court solely through its supplemental jurisdiction—and the Court has granted summary judgment to Grenadier on Plaintiff's federal claim—the Court declines to reach the merits of the NYCHRL claim.

"District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be

43

considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citations omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *see also One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

In this Circuit, NYCHRL claims must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Given the "slow development of case law regarding the appropriate standard by which to evaluate NYCHRL claims at the summary judgment stage," *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d

816, 835 (S.D.N.Y. 2013), the separate and independent inquiry the Court would need to undertake in this "evolv[ing]" area of law, *see id.* at 835 n.6, the factors of convenience, comity and judicial economy favor declining jurisdiction over Plaintiff's NYCHRL claims, *see, e.g., Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 37 (E.D.N.Y. 2015) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment as to ADEA and NYSHRL age discrimination and retaliation claims); *Downey v. Adloox Inc.*, No. 16-CV-1689 (JMF), 2018 WL 5266875, at *9 (S.D.N.Y. Oct. 23, 2018) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting summary judgment for defendants with respect to ADEA and NYSHRL claims); *Herrnson v. Hoffman, No. 19-CV-7110 (JPO)*, 2023 WL 2647603, at *5 (S.D.N.Y. Mar. 27, 2023) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment on ADEA claim).

Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's claims under the NYCHRL, and they are dismissed, without prejudice to her right to re-file them in state court.

**B.  NYSHRL Claim**

Plaintiff also brings claims of age discrimination under the NYSHRL, over which the Court also declines to exercise supplemental jurisdiction.

45

Until recently, courts have adjudicated claims brought under the ADEA and NYSHRL together, as these statutes applied identical standards. *See, e.g., Downey v. Adloox, Inc.*, 789 F. App'x 903, 905 (2d Cir. 2019) ("Because ADEA claims have been held to be identical to NYSHRL claims, both are analyzed under the same framework.")  As under the ADEA, plaintiffs bringing age-discrimination claims under the NYSHRL had the burden of proving that age was the "but-for" cause of the challenged adverse employment action.  *See Gorzynski*, 596 F.3d at 105 n.6 ("The law governing ADEA claims has been held to be identical to that governing claims made under the NY[S]HRL . . . we assume, without deciding, that the Supreme Court's *Gross* decision affects the scope of the NY[S]HRL law as well as the ADEA.") (citing *Sutera v. Schering Corp.*, 73 F.3d 13, 16 n.2 (2d Cir. 1995)).

The similar standards, however, have recently changed.  "The NYSHRL was amended on August 19, 2019 to provide that its provisions should be construed liberally 'regardless of whether federal civil rights law, including those laws with provisions worded comparably to the provisions of this article, have been so construed.'" *Deveaux v. Skechers USA, Inc.*, No. 19-CV-9734 (DLC), 2020 WL 1812741, at * 3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting Act of Aug. 12, 2019, sec. 6, 2019 N.Y. Laws 160 (codified at N.Y. Exec. Law § 300 (2019))).  "In other words, the NYSHRL was amended to render the standard for claims closer to the standard under the

46

NYCHRL." *Summit v. Equinox Holdings, Inc.*, No. 20-CV-4905 (PAE), 2022 WL 2872273, at *18 (S.D.N.Y. July 21, 2022) (internal quotation marks and citation omitted); *see also Williams v. N.Y.C. Transit Auth.*, 97 N.Y.S.3d 692, 695-96 (2d Dep't 2019) ("[W]here an adverse employment action is shown to be 'motivated by [unlawful] animus, even in part, the defendant may be held liable' under the NYCHRL.") (quoting *Singh v. Covenant Aviation Sec., LLC*, 16 N.Y.S.3d 611, 616 (2d Dep't 2015)).  The amendment was signed in August 2019 and applies to claims occurring on or after October 11, 2019, without retroactive effect.  *See McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).

Because Plaintiff's primary claim relates to her termination in March 2020, the Court finds that the NYSHRL amendment would apply to at least that aspect of the instant case, if not all of Grenadier's actions leading up to her termination.  The Defendants initially did not account for the revised standard in their motion for summary judgment, analyzing the ADEA and NYSHRL claims as coextensive.  (*See* Def. Mem. at 5 n.2 ("Age discrimination claims under the NYSHRL are analyzed under the same framework as the ADEA." (citation omitted)).)  Plaintiff noted this oversight and explained the impact of the 2019 amendments on the NYSHRL.  (Pl. Mem. at 8.)  Defendants subsequently argued in their reply briefing that "nearly all of Plaintiff's allegations occurred prior to October 2019, including her demotion claim" but went on to address

SPA-48

Plaintiff's NYSHRL claim alongside Plaintiff's NYCHRL claim "to clearly illustrate that Plaintiff's state law claim is still meritless." (Def. Reply at 9 n.6.) That the Defendants initially briefed the NYSHRL claims under an outdated legal standard, at least in part, reinforces the reasons, articulated above in the discussion of Plaintiff's NYCHRL claims, for not exercising supplemental jurisdiction over these claims.

Considering the factors for exercising supplemental jurisdiction over the NYSHRL claims, the Court also dismisses those claims, like the NYCHRL claims, without prejudice. *See, e.g., Halkitis v. N.Y.C. Dep't of Educ.*, No. 19-CV-11753 (JMF), 2022 WL 392911, at *7 (S.D.N.Y. Feb. 9, 2022) (declining to exercise supplemental jurisdiction over NYSHRL and NYCHRL claims as matters "best left to the courts of the State of New York") (citations omitted); *Summit*, 2022 WL 2872273, at *18 (same).

SPA-49

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's ADEA claims and declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims. Plaintiff's claims under the NYSHRL and NYCHRL are dismissed without prejudice to Plaintiff's right to re-file and pursue them in state court. The Clerk of Court is requested to enter judgment in favor of the Defendants on Plaintiff's ADEA claims, dismiss the NYSHRL and NYCHRL claims without prejudice, and close this case.

**SO ORDERED.**

Dated:      August 12, 2024
            Brooklyn, New York

                        _____
                        **HON. KIYO A. MATSUMOTO**
                        United States District Judge
                        Eastern District of New York

49